SHREDDED WHEAT CO. v. HUMPHREY CORNELL CO. et al.

(District Court, D. Connecticut. May 2, 1917.)

No. 1436.

1. TRADE-MARKS AND TRADE-NAMES ⬯11—UNFAIR COMPETITION—IMITATION.
    Plaintiff manufactured a shredded wheat biscuit of a peculiar size, form, color, and appearance, which had become well known to the public. It owned patents covering an article of food consisting of threads or filaments of wheat or similar grain having the outer nutrition bran and gluten of the entire berry visibly mixed with the interior starchy portion thereof, and also a process patent covering the method of preparing the grain or berry. A design patent covered the form and configuration of the biscuit; the specification stating that the design consisted in a biscuit presenting a fibrous interstitial appearance, with interlacing threads or filaments, and that the general form of the biscuit shown in the drawings was as stated therein. *Held*, that these patents did not take the case out of the law of unfair competition, so as to give defendant the right, upon the expiration of the monopoly, of using the size, shape, and color of plaintiff's product, with its identifying name and dress.

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2.** TRADE-MARKS AND TRADE-NAMES ⬳79—INJUNCTION—PURPOSES.

The purpose to be effected by an injunction in cases of unfair competition is not primarily to protect the purchaser, but to secure to the manufacturer the profit to be derived from the sales of his goods to all those desiring and intending to purchase them; it being the liability to injury and an actual infringement which the remedy may be invoked to prevent.

**3.** TRADE-MARKS AND TRADE-NAMES ⬳70(1)—UNFAIR COMPETITION—IMITATION.

Where plaintiff was manufacturing a shredded wheat biscuit of peculiar size, form, and appearance, which had become well known to the public, and defendants were selling a similar biscuit in cartons bearing a pictorial representation of a shredded wheat biscuit, which was an exact copy of plaintiff's biscuit, so that one was apt to be mistaken for the other, though on comparison of the two cartons substantial differences would be found and careful buyers might not be deceived, defendants would be enjoined from the use of such pictorial representation on their carton.

**4.** TRADE-MARKS AND TRADE-NAMES ⬳69—UNFAIR COMPETITION—GOOD FAITH AS DEFENSE.

Defendants' good faith in using a pictorial representation of plaintiff's shredded wheat biscuit on the carton containing its biscuits is immaterial.

**5.** TRADE-MARKS AND TRADE-NAMES ⬳70(3)—UNFAIR COMPETITION—IMITATING NAMES OF ARTICLES.

Where the names "Shredded Wheat" and "Shredded Whole Wheat," though in a way abstract in character and descriptive, had become associated with plaintiff's goods in particular, and had come to mean its goods alone, the court will enjoin defendant from using such words in connection with the sale of a similar biscuit, unless they marked their packages and product, so as to clearly and unmistakably specify that it was their own product, and not that of plaintiff.

**6.** TRADE-MARKS AND TRADE-NAMES ⬳93(1)—UNFAIR COMPETITION—PRESUMPTIONS.

The natural presumption is that one adopting a name for its product, which has become associated in the public mind with a product of another, expects to derive benefit from the name, and to secure buyers from among those' who have bought and used the product of such other, and it may be justly assumed that they intend to mislead, and that their acts are likely to accomplish this intent.

**7.** TRADE-MARKS AND TRADE-NAMES ⬳70(1)—UNFAIR COMPETITION—IMITATION.

Where plaintiff manufactured a shredded wheat biscuit of a peculiar form, shape, size, and color, and defendants' product was copied therefrom in its entirety, the court will enjoin defendant from manufacturing or selling whole wheat biscuit in the form, shape, size, and color of plaintiff's biscuit, or any imitation thereof, without marking on each biscuit words clearly and unmistakably specifying its origin.

**8.** TRADE-MARKS AND TRADE-NAMES ⬳75—UNFAIR COMPETITION—DECEPTION OF PUBLIC.

The vital question in cases of unfair competition is not whether dealers are liable to be deceived in buying from the manufacturer or wholesaler, but whether the user is liable to be misled in buying from the retailer.

**9.** TRADE-MARKS AND TRADE-NAMES ⬳98—UNFAIR COMPETITION—RIGHT TO ACCOUNTING.

Where, in a suit for unfair competition, it appears that defendants' sales were small and its profits negligible, and that the profits and damages together would be too small to justify the expense of taking an account, no accounting will be ordered.

---

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity.    Suit by the Shredded Wheat Company against the
Humphrey Cornell Company and another.    Decree for plaintiff.

Charles K. Offield, of Chicago, Ill., William C. Breed and Frederick
I. Allen, both of New York City, and George D. Seymour, of New
Haven, Conn., for plaintiff.

John R. Nolan and James H. Griffin, both of New York City, David
Tice, of Lockport, N. Y., and Arthur Keefe, of New London, Conn.,
for defendants.

THOMAS, District Judge.    This is a suit in equity, charging the
defendants with unfair trading, and is now before the court on final
hearing upon pleadings and proofs.

The gravamen of the bill is contained in the fourth and fifth para-
graphs which reads as follows:

(4) "That from the beginning of the manufacture of whole wheat biscuit
by your orator's predecessors and continuously to the present time your ora-
tor has manufactured for sale and consumption such biscuit in a particular
and peculiar shape and form; that such biscuit was produced and baked so
as to present a distinguishing eye appearance, at once recognized by the con-
figuration of such biscuit, from any other form of food product ever before
manufactured either from wheat or any cereal of similar or allied purpose;
that the whole wheat biscuits of your orator were composed and built up of
wheat fashioned in peculiar form, laminated in structure and appearance, and
to which your orator has attached the fanciful name of 'shreds'—the biscuit
as completed in final form being a rectangular flattened oval, with rounded
sides or edges and sharply severed ends being a biscuit browned in appearance
as to its upper face and rendered crisp and palatable as to its separate parts
in baking."

(5) "That during nearly a quarter of a century that your orator has formed
and baked its whole wheat biscuit product in the form and conditions above
recited and identified, said biscuits have become known for a long period of
years past to the using and purchasing public by reason alone of the par-
ticular form, shape and structure of the individual biscuit itself as above de-
scribed; your orator averring that for many years past such whole wheat
biscuit of your orator has come to have and now has a secondary significance
and meaning to the purchasing public by reason of the facts above set forth,
and to thus mean and signify only the product and biscuit output of your
orator, your orator averring that, when your orator's said biscuit product is
separated from your, orator's carton and advertising matter, and standing
alone without other means of identification, your orator's said biscuit has
come to have the meaning and significance of the product and output only of
your orator's plant."

The defenses pleaded at length may be summarized as follows:

(1) "That the form, size, color, and appearance of the biscuits (plaintiff's and
defendants') involved in this controversy result from, and are essential to,
the economic manufacture of a commercial biscuit from shredded whole
wheat. * * *"

(2) "That the defendants' biscuit is composed of shredded whole wheat, the
physical characteristics of which are such that the biscuit cannot be directly
branded or stamped with the name or trade-mark of the maker."

(3) "That to inclose the individual biscuits of the defendants in an envelope
or wrapper would be commercially prohibitive, by reason of the increased cost
of that procedure."

(4) "That the defendants' biscuit is not labeled or dressed in simulation of
plaintiff's product; but, on the contrary, the dress of the defendants' prod-
uct is most decidedly individual and distinctive."

(5) "That the defendants' biscuit is a patent-expired product."

(6) "That the size, form, shape, color, and appearance of plaintiff's biscuit were not adopted or selected for the purpose of pointing to the origin or ownership of the article, but are the natural characteristics of a shredded wheat biscuit, made in full accordance with the patent-expired machines."

So that the issue to be here determined is this: Are the defendants guilty, in view of the facts in the case, of unfair competition in trade in selling a biscuit of substantially the same size, form, color, and appearance as that of the plaintiff?

The bill of complaint, as it was originally filed, named five defendants—the Ross Food Company, a New York corporation, Andrew Ross, Ralph Valentine, the Humphrey Cornell Company, a Connecticut corporation, and Frederick H. Towne. Of these defendants, the first three have been dropped on motions challenging the jurisdiction of the court, and the action has been continued and is now pending against the defendants the Humphrey Cornell Company and Frederick H. Towne, as to both of whom the court has retained jurisdiction. Although the defendants named in the bill as originally filed, other than the Humphrey Cornell Company and Towne, are not parties to this action, they must, by reason of their subsequent participation in the trial with the knowledge of the court and of all the parties to the record, as was the case here, be held to be privies to any judgment which may be recovered herein, and will be fully bound thereby. Souffront v. Compagnie Des Sucreries, 217 U. S. 475, 486, 30 Sup. Ct. 608, 54 L. Ed. 846; Washington Gas Co. v. District of Columbia, 161 U. S. 316, 16 Sup. Ct. 564, 40 L. Ed. 712.

The facts as developed by the evidence are as follows:

The plaintiff is the successor in business of the Cereal Machine Company, a Colorado corporation organized in 1893 by Henry D. Perky, the founder of the business. The shredded wheat product, so called, of the plaintiff, is now, as it always has been, made from whole wheat of the highest grade and quality, and with great skill, in the plaintiff's plant in Niagara Falls, N. Y., the sanitary and mechanical methods of which, in all of their appointments, are of superlative excellence. The product retains the body and substance of the whole wheat in final biscuit form, and is at once recognized by the configuration of the biscuit from all other forms of food products ever before manufactured from wheat or any cereal of similar or allied character.

The whole wheat berry is thoroughly cooked by boiling without destroying the berry form, and then all parts of the individual berry are swaged and commingled together by passing through grooved rollers, from which they are discharged in the form of long, fine filaments or threads of porous character having a rough exterior, so that they are adapted to and do adhere together when being massed to form loaves or biscuits, and the food as discharged from the rolls is ready for use without further cooking, or it can be shaped for baking in various ways. After it is discharged from the rolls it is baked a golden brown, 12 biscuits are packed in a carton, 36 cartons in each case, and the product is shipped to the wholesale grocer, who in turn sells it to the retail grocer, and he to the ultimate consumer.

The plaintiff's product was protected by two patents—one for bread and the method of preparing the same, No. 548,086, dated October 15, 1895, and which accordingly expired October 15, 1912; and the other a design patent, No. 24,688, dated December 17, 1895, for 14 years, and which accordingly expired December 17, 1909. Since the expiration of these patents, with the exception of the defendants and those in privity with them, the plaintiff has been the only person using this particular form, shape, color, and size of shredded wheat biscuit, all of which features have been appropriated by the plaintiff.

An enormous trade in these biscuits has been built up and established all over the world by the plaintiff as the result of a long campaign covering a period of about 15 years by vigorous and expensive advertising. So great has been the advertising expense that in 1914 between $800,000 and $1,000,000 was expended. The business has steadily and consistently increased from year to year. In 1901 the number of individual biscuits produced and sold amounted to 175,000,000, and this production constantly increased until in 1915 it amounted to approximately 500,000,000 biscuits. In other words, the gross business increased from about $1,250,000 in 1901 to over $4,000,000 in 1915.

The ultimate consumer, whether in private homes, boarding houses, or at hotels and restaurants, only knows the individual biscuit to which he has become accustomed, and never sees the package in which it is offered for sale by the retailer.

Some six years after the expiration of the design patent, Ross, Towne, and Valentine, who had been in the employ of the plaintiff and were familiar with the manufacturing processes and business and advertising and trade policies of the plaintiff, organized the Ross Food Company, a New York corporation located at Batavia, for the purpose of entering into competition with the plaintiff, although there was then, and for quite a time previous thereto had been, other forms of shredded wheat biscuit, which could be and were easily identified from the product of the plaintiff and its predecessor.

Towne, who is a stockholder in and the New England agent for the Ross Food Company, thereupon solicited the Humphrey Cornell Company, a wholesaler and jobber in this district, to distribute the product of the Ross Food Company throughout Connecticut, Rhode Island, and parts of New York, which the Humphrey Cornell Company undertook to do and did do, and the defendants' product was sold by the Humphrey Cornell Company and Towne to the retail trade in the territory named, but in very small quantities.

The visual appearance of the defendants' product, as it is made and served, is exactly like that of the plaintiff in shape, size, color, and form, all of which were adopted by the plaintiff, not because of any inherent or functional advantage or value resulting therefrom, but purely as a matter of accident, resulting from the size and shape of the rolls of the plaintiff's machinery from which it was discharged ready for use. Indeed, there is an apparent disadvantage in the shape and size of the product as made by the plaintiff and copied by the defendants, as a circular biscuit would be much more adaptable to a saucer or bowl than is one of oblong form, and a very different gen-

eral appearance would be just as advantageous as the defendants' unless they desired, in copying it exactly, to get away the plaintiff's customers.

Although the carton or package containing the defendants' biscuit is of an entirely different shape and color from that of the plaintiff's .carton, there is, nevertheless, printed upon the face of defendants' package a picture of a shredded wheat biscuit which is an exact reproduction of plaintiff's product, and although the defendants characterize their product as "Ross's Whole Wheat Biscuit," they do not in any other way show or attempt to show that their product is not that of the plaintiff, and the individual biscuit of the defendants, when disassociated from the carton, bears no mark, stamp, brand, or tag whereby the individual consumer can be informed that it is not the plaintiff's product. The machinery used by the Ross Food Company in the manufacture of its product is substantially copied from that used by the plaintiff in building up and carrying on its trade. Moreover, the plaintiff's product has been particularly recognized solely by reason of the form, shape, size, and color of the individual or unit biscuit, and through the personal efforts of the plaintiff's officers and salesmen the plaintiff's business has been so directed and conducted as to definitely fix and impress this fact upon the public.

[1] The vital, and indeed the sole, question of defense is: Have the plaintiff's patents taken the case out of the law of unfair competition, and are the size, shape, and color of the plaintiff's product, together with the identifying name and dress, open to the public upon the expiration of the monopoly granted by these patents? If this were a case of a technical trade-mark purely, it would be controlled by the authority of Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118, Centaur Co. v. Heinsfurter, 84 Fed. 955, 28 C. C. A. 581, and Linoleum Manufacturing Co. v. Nairn, 7 Ch. Div. 834. But it is not. It is exclusively a case of unfair competition, which involves something more than a generic name, by which the object has become known to the public, and which also involves rights not covered by or included in the monopoly of either of the patents relied on. The invention of the patent for the bread and its method of manufacture relate exclusively, as the specification states, to—

"the production of an article of food or bread. consisting of externally rough porous threads or filaments of wheat or similar grain, having the outer nutrition bran and gluten of the entire berry visibly mingled with the interior starchy portion thereof and adapted by their composition of entire grain berries and their rough and porous threadlike or shredlike form to constitute, without other shortening or aeration, bread of especially light and wholesome character."

And it consists—

"in the novel art or method of preparing the grain or berry and reducing it to form without taking from the grain any of the beneficial qualities provided by nature and presenting the same in convenient form for service as a superior article of food without the aid of experts or skilled labor now required to produce palatable bread."

Its feature of patentable novelty, wherein it is distinguished from the prior art, lies in the fact that the wheat is taken in the whole berry

244 F.—33

form, and, after being cleaned and thoroughly washed, is boiled until cooked without destroying the whole or individual form of the berry, and the sinuous form and rough or jagged exterior shape of the filaments are designed to provide small interstices throughout the mass whereby the bread is thoroughly aerated and made very light, and the food is discharged from the rolls ready for use without further cooking, or it is shaped for baking in various ways, is pure wheat, and the parts of the berry are given to .the consumer in attractive form, without the chemical change set up therein by the use of ferments or other foreign ingredients. Moreover, the claims of the patents are strictly limited to the features recited. Claim 1, which is for the product, is:

"1. A food or bread composed of superposed or massed layers or deposits of dry, externally rough, porous, sinuous threads or filaments of cooked whole wheat containing intermixed the bran, starch, and gluten of the entire berry, and which is absolutely free from leavening or raising materials, or their products."

Claim 2, which is for the process, is:

"2. The process of reducing cereals for food, consisting first, in cooking the grain with salt, after it has been thoroughly cleaned, without destroying the whole berry form; second, partially drying the grain with constant agitation until its interior and exterior portions are of substantially the same consistency; and finally, compressing the grain to intimately commingle the outer or bran coats, gluten layers, and starchy, interior portions in the form of porous, rough filaments or threads, substantially as described."

It will be seen, from a careful reading of the specification and claims of this process patent, that it has nothing to do whatsoever with the form or shape or size of the biscuit, and, so far as this patent is concerned, it was open to the defendants upon its expiration, to make and sell a whole wheat biscuit without copying in any way the form, shape, size, or color of the plaintiff's biscuit as disclosed in the process patent.

The design patent, as the specification states—

"has relation to a certain new and original design for biscuits; and it consists in the novel form and configuration thereof, as hereinafter described, and shown in the accompanying drawings."

The specification then goes on to state that:

"The leading feature of the design consists in a biscuit, which presents a fibrous interstitial appearance, showing superimposed layers or irregular interlacing threads or filaments, which are wound or disposed in such loose relation to each other that the threads or filaments of the inner layers are visible from the surface to a greater or less degree through the interstices of the outer layers. The general form of the biscuit shown in the drawings, when viewed in plan, is that of a parallelogram, and when viewed in end elevation or cross-section is a flattened oval, with slight creases along the longitudinal edges; its distinguishing characteristic being mainly, as above stated, its fibrous interstitial appearance."

The design patent has nothing to do with the form, shape, or size of the biscuit, and the distinguishing characteristic of the design was "its fibrous, interstitial appearance." I am therefore impelled to the conclusion that neither of these patents, nor, indeed, any of the other patents offered in evidence, and which are purely mechanical, take

the case out of the law of unfair competition. The fact is beyond cavil that the carton and the shape, size, and color of the plaintiff's product, together with the words "Shredded Wheat" and "Shredded Whole Wheat," have been used so long and so exclusively by the plaintiff as to designate, with reference to the plaintiff's product, in the trade and to the purchasing public, that the carton, the words, and the article itself have each and all come to mean that the article made or sold as "Shredded Wheat" or "Shredded Whole Wheat" is the plaintiff's product. Hence the case falls directly within the ruling of Lord Herschell in Reddaway v. Banham [1896], L. R. Appeal Cases, 199, of a descriptive word used so—

"as to induce in purchasers the belief that they are getting the goods of the manufacturer who has heretofore employed it as his trade-mark."

And if that is the case the law clearly imposes upon the defendants the burden of being required to use the carton, and the words, and the article itself with sufficient distinguishing marks to prevent the purchasing public from being deceived into buying the defendants' product as and for the plaintiff's product.

There is nothing in the Singer Case, or in any of the other authorities, which is in any way inconsistent with this conclusion. In the Singer Case, where the right of the defendant to use the name "Singer" in relation to sewing machines was established, it was coupled with the restriction that in so doing it must be made clearly and unmistakably to appear that the machines were manufactured by others than the complainants. Although the right to manufacture Singer sewing machines had become public property by the expiration of the patents, nevertheless the right of the original manufacturers to be protected from fraudulent imitation of the indicia by which Singer machines made at their establishment had been known to the trade was upheld, without regard to the fact whether these devices had been adopted during the life of the patent or after its expiration. Mr. Justice White, in delivering the opinion of the court in Singer Mfg. Co. v. June, 163 U. S. 169, 197, 16 Sup. Ct. 1002, 1013 [41 L. Ed. 118], quotes with approval from Pouillet, Brevets d'Invention, Nos. 327, 328, as follows:

"The expiration of a patent has for its natural effect to permit every one to make and sell the object patented; and it has also for effect to authorize every one to sell it by the designation given it by the inventor, but upon the condition in every case not, in so doing, to carry on unfair competition in business (concurrence de loyal) against him. * * * "

And the closing paragraph of his opinion in Singer Mfg. Co. v. Bent, 163 U. S. 206, 16 Sup. Ct. 1016, 41 L. Ed. 131, is as follows:

"There is no doubt that the marks were imitations of those used by the Singer Company, and were intended to deceive, and were made only seemingly different to afford a plausible pretext for asserting that they were not illegal imitations, although they were so closely imitative as to deceive the public. The defendant, therefore, must be treated as if he had actually used the Singer marks. So treating him, however, we should be obliged to allow the use of the name 'Singer,' since that name, as we have already held in the case just decided, fell into the domain of things public, subject to the condition on the one who used it to make an honest disclosure of the source of manufacture."

In Centaur Co. v. Killenberger (C. C.) 87 Fed. 725, it was held, notwithstanding the rule laid down in the Singer Cases, that distinctive labels long used on patented articles do not become free to the public on the expiration of the patent, and that, where plaintiff's package and label is not exactly imitated by defendant, but is made so nearly like it in general appearance that one is apt to be mistaken for the other by intending purchasers, and that a close inspection is necessary to distin-. guish them, the use of the label by the defendant, or of one substantially similar thereto, will be enjoined. To the same effect is Centaur Co. v. Neathery, 91 Fed. 891, 34 C. C. A. 118, in which it was held that, while the right to manufacture "Castoria" according to a patented process or formula, and the right to sell the manufactured article under the name "Castoria," is free to the world since the expiration of the patent, yet, in placing it upon the market, the new manufacturer must clearly identify his goods, and not engage in unfair competition, nor do anything which will tend to deceive the public, and induce it to purchase his goods under the belief that they are those it has been accustomed to purchase under the same name.

This view of the law, and particularly in its aspect pertinent to the case at bar, is admirably stated in G. & C. Merriam Co. v. Saalfield, 198 Fed. 369, 117 C. C. A. 245, by the Circuit Court of Appeals for the Sixth Circuit. It was there distinctly held that, on the expiration of a patent or copyright, the situation arising with respect to the use by others of the name of the patented article or copyrighted book cannot be differentiated from that arising with respect to the use of any other descriptive word, and that, while any subsequent maker of the article or publisher of the book has the right to use the name, because it has come to be a word of apt description, if, by reason of its long and exclusive use by the original maker or purchaser, it has come to be indicative of his product, and he continues its use, he is entitled to protection against unfair competition in such use, and the right of another to use it is qualified by the requirement that he must accompany it with an explanation which will unmistakably inform the public that the article or book is of his production.

In the same case—Merriam v. Saalfield—which again came before the Circuit Court of Appeals on appeal from decrees entered in purported compliance with the mandate contained in 198 Fed. 369, 117 C. C. A. 245, the court reiterated its views in an opinion handed down January 13, 1917, and found in 238 Fed. 1, on page 8, —— C. C. A. ——, and said:

"It is not of controlling importance to the true application of the secondary meaning theory that the public should appreciate the personal indentity of the manufacturer. The deception involved in every such case, as in a trademark case, is said to be a deception as to the origin of the goods; but this is a formula for expressing the ultimate result. With reference to articles which have trade-names, it is the article itself and its good qualities, which the public appreciates and which cause it to desire to get the genuine article, made by the manufacturer who has established its reputation, rather than something made by some one else. Particularly under present-day conditions, the purchasing public may have a fixed purpose to buy a given article, and not a substitute therefor, and yet be quite ignorant whether the genuine article is made by one or another manufacturer. Even under earlier conditions,

the purchaser of 'Stone Ale,' or 'Camel's Hair Belting,' or 'Glenfield Starch,' very likely knew as little as he cared about the personal identity of the maker."

In Jenkins Bros. v. Kelly & Jones Co., 227 Fed. 211, 142 C. C. A. 11, a case of unfair competition arising after the expiration of patents on the plaintiff's goods, it was held that courts do not decide misleading markings on manufactured goods, the patent on which has expired, by the caveat emptor rule of buyer and seller, but on the theory that a buyer who has become accustomed to a particular article is entitled to be unmistakably informed that a person other than the former maker is manufacturing the same, and that the rights of rival makers are not the only thing to be considered. Judge Buffington, delivering the opinion of the court, said (227 Fed. on page 213, 142 C. C. A. on page 13):

"From this it will be seen that the sum and substance of the marking is not the mere literal, physical stamping, printing, or engraving of the maker's name on an article which in the public mind is associated with another's business, but the name must be accompanied with such indications that the thing manufactured is the work of the one making it as will 'unmistakably inform the public of that fact.'"

I am convinced that the plaintiff is entitled to an injunction, and the only question is as to the extent to which it shall go. In view of the circumstances of the case, taken in connection with the settled practice obtaining in this circuit, the terms of the injunction will be settled before its issuance, and in order to avoid any further argument on this question, the terms of the injunction order, together with the reasons for the same, are set forth at length.

[2] First. The purpose to be effected by an injunction in cases of unfair competition is not primarily to protect the purchaser, but to secure to the manufacturer the profit to be derived from the sales of his goods to all who may desire and intend to purchase them. It is the liability to injury and an actual infringement which the remedy may be invoked to prevent. Williams v. Brooks, 50 Conn. 278, 279, 47 Am. Rep. 642; T. A. Vulcan v. Myers, 139 N. Y. 364, 34 N. E. 904; N. K. Fairbank Co. v. Luckel, King & Cake Soap Co., 102 Fed. 327, 42 C. C. A. 376.

[3, 4] Second. The plaintiff is entitled to an injunction restraining the use of the pictorial representation of the plaintiff's biscuit on the defendants' carton. While it is true that, upon an examination and comparison of the two cartons, side by side, substantial differences will be found, the outstanding fact is that the defendants have placed upon their cartons a pictorial representation of a shredded wheat biscuit, which is an exact copy of plaintiff's biscuit, so that one is apt to be mistaken for the other, in which case a careful inspection is necessary to distinguish them, unless there are marked thereon words which clearly specify that the product contained therein is the product of the defendants or other manufacturer, and not the product of the plaintiff. Even the good faith of the defendant, if it existed, and I do not believe it did, would be immaterial, and the fact that careful buyers may not be deceived is of no consequence, as such fact would only show that the

injury is less, not that there is no injury. Another class of purchasers may be deceived, and, if they may be, the plaintiff is entitled to an injunction. Collinsplatt v. Finlayson (C. C.) 88 Fed. 693; Meriden Britannia Co. v. Parker, 39 Conn. 450, 12 Am. Rep. 401; International Silver Co. v. Rogers Corpn., 67 N. J. Eq. 646, 650, 60 Atl. 187, 110 Am. St. Rep. 506, 3 Ann. Cas. 804; Reading Stove Works v. S. M. Howes Co., 201 Mass. 437, 87 N. E. 751, 21 L. R. A. (N. S.) 979; Lever v. Goodwin, L. R. 36 Ch. Div. 1; Saxlehner v. Eisner & Mendelson Co., 179 U. S. 19, 41, 21 Sup. Ct. 7, 45 L. Ed. 60; New England Awl & Needle Co. v. Marlborough Awl & Needle Co., 168 Mass. 154, 46 N. E. 386, 60 Am. St. Rep. 377. The case is one where no amount of diligence on the part of the plaintiff can or would guard against the injury. Meriden Britannia Co. v. Parker, supra.

As was said by Mr. Justice Bradley in Celluloid Mfg. Co. v. Cellonite Mfg. Co. (C. C.) 32 Fed. 94, 97:

"Similarity, not identity, is the usual recourse, when one party seeks to benefit himself by the good name of another."

The controlling principle is well stated by Lord O'Hagan in Singer v. Wilson, 3 L. R. Appeal Cases, 376, in the following words:

"I think we should be cautious in holding that, although a person of intelligence and observant habits might, in a case like this, by exercising reasonable vigilance, escape misleading, there should be no restrictive interference to prevent others from being misled. It is a question of degree, of more or less; there can be no rigid rule, and the special facts must be considered in every case. There are multitudes who are ignorant and unwary, and they should be regarded in considering the interest of traders who may be injured by their mistakes. If one man will use a name, the use of which has been validly appropriated by another, he ought to use it under such circumstances and with such sufficient precautions that the reasonable probability of error should be avoided, notwithstanding the want of care and caution which is so commonly exhibited in the course of human affairs."

Judge Lacombe, speaking for the Circuit Court of Appeals for this circuit in Enterprise Mfg. Co. v. Landers, Frary & Clark, 131 Fed. 240, 241, 65 C. C. A. 587, 588, said:

"A court of equity will not allow a man to palm off his goods as those of another, whether his misrepresentations are made by word of mouth, or, more subtly, by simulating the collocation of details of appearance by which the consuming public has come to recognize the product of his competitor."

The test in all cases of this kind is: Has the ensemble come to be a public guaranty of origin and quality? Enoch Morgan's Sons Co. v. Ward, 152 Fed. 690, 81 C. C. A. 616, 12 L. R. A. (N. S.) 729.

[5] Third. The plaintiff is entitled to an injunction restraining the use by the defendants of the words "Shredded Wheat" and "Shredded Whole Wheat," unless the defendants mark their packages and product so as to clearly and unmistakably specify that the same is the product of the defendant or other manufacturer, and not the product of the plaintiff.

In view of all the circumstances of the case as set forth in the proofs, it seems reasonably clear that the words "Shredded Wheat" and "Shredded Whole Wheat," although in a way abstract in character, have become associated with the goods of the plaintiff in particular, and

have come to mean the plaintiff's goods alone. While it may be conceded that they could not be adopted as a technical trade-mark, because descriptive, nevertheless they necessarily and naturally point to the source or origin of the product, and indicate an identity between the plaintiff and the names in question. The rule on this subject was forcibly stated by Lord Herschell in Reddaway v. Benham, supra, 210, in the following words:

"The name of a person, or words forming part of the common stock of language, may become so far associated with the goods of a particular maker that it is capable of proof that the use of them by themselves without explanation or qualification by another manufacturer would deceive a purchaser into the belief that he was getting the goods of A. when he was really getting the goods of B."

[6] The natural presumption is that the defendants expect to derive benefit from the name, and to secure buyers from among those who had bought and used the plaintiff's product, and it may be justly assumed that the defendants by the use of these words intend to mislead, and not in good faith to convey information, and this assumption, carried to its logical conclusion, means that the defendants' acts are likely to accomplish what the defendants intended they should. Wotherspoon v. Currie, L. R. 5 House of Lords, 508; Keller v. Goodrich Co., 117 Ind. 556, 19 N. E. 196, 10 Am. St. Rep. 88; R. Heinisch's Sons Co. v. Boker (C. C.) 86 Fed. 765. This rule has been generally adopted by the American courts. Herring-Hall Marvin Safe Co. v. Hall's Safe Co., 208 U. S. 554, 28 Sup. Ct. 350, 52 L. Ed. 616; Standard Varnish Works v. Fisher, Thorsen & Co. (C. C.) 153 Fed. 928; Cady v. Schultz, 19 R. I. 193, 32 Atl. 915, 29 L. R. A. 524, 61 Am. St. Rep. 763; Hansen v. Siegel-Cooper Co. (C. C.) 106 Fed. 691; American Waltham Watch Co. v. U. S. Watch Co., 173 Mass. 85, 53 N. E. 141, 43 L. R. A. 826, 73 Am. St. Rep. 263. And the question in all of these cases is, not whether the plaintiff has a property in the words or name, but whether or not the defendants have sought to prevail on purchasers to buy their goods believing they were getting the goods made by the plaintiff; and if the plaintiff can prove that the term in question has, in addition to its usual meaning descriptive of the kind of goods made by the plaintiff, the further meaning that such goods are the particular goods made by the plaintiff, and that the public understands this to refer only to goods made by the plaintiff, and that the defendant has used the name in order to attract to himself that custom which, without the improper use of such names, would have flowed to the plaintiff, the plaintiff is then entitled to an injunction. Van Horn v. Coogan, 52 N. J. Eq. 380, 28 Atl. 788.

As pointed out in Merriam v. Saalfield, supra, there is nothing abstruse or complicated about this theory, although its application may sometimes be difficult. Judge Denison said (198 Fed. page 373, 117 C. C. A. page 249):

"It contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless have been used so long and so exclusively by one producer with reference to his article that, in that trade and to that branch of the purchasing public,

the word or phrase had come to mean that the article was his product; in other words, had come to be, to them, his trade-mark. So it was said that the word had come to have a secondary meaning, although this phrase, 'secondary meaning,' seems not happily chosen, because, in the limited field, this new meaning is primary rather than secondary; that is to say, it is, in that field, the natural meaning. Here, then, is presented a conflict of right. The alleged trespassing defendant has the right to use the word, because in its primary sense or original sense the word is descriptive; but, owing to the fact that the word has come to mean, to a part of the public, something else, it follows that when the defendant approaches that same part of the public with the bare word, and with nothing else, applied to his goods, he deceives that part of the public, and hence he is required to accompany his use of the bare word with sufficient distinguishing marks normally to prevent the otherwise normally resulting fraud."

In Elgin Nat. Watch Co. v. Illinois Watch Co., 179 U. S. 665, on page 673, 21 Sup. Ct. 270, on page 274 (45 L. Ed. 365), Chief Justice Fuller, in writing the opinion of the Supreme Court, said:

"But it is contended that the name 'Elgin' had acquired a secondary signification in connection with its use by appellant, and should not, for that reason, be considered or treated as merely a geographical name. It is undoubtedly true that where such a secondary signification has been acquired, its use in that sense will be protected by restraining the use of the word by others in such a way as to amount to a fraud on the public, and on those to whose employment of it the special meaning has become attached. In other words, the manufacturer of particular goods is entitled to the reputation they have acquired, and the public is entitled to the means of distinguishing between those, and other, goods; and protection is accorded against unfair dealing, whether there be a technical trade-mark or not."

Then follows a succinct statement of the rule applicable in cases of unfair competition, which, is particularly pertinent here. The Chief Justice said:

"The essence of the wrong consists in the sale of the goods of one manufacturer or vendor for those of another."

[7] Fourth. As the defendants' product has been copied in its entirety from that made by the plaintiff, the plaintiff is entitled to an injunction restraining and enjoining the defendants from manufacturing or selling whole wheat biscuit in the form, shape, size, and color of the plaintiff's biscuit, or in any imitation thereof, unless there is marked on each biscuit words which clearly and unmistakably specify that the same is the product of the defendants, or other manufacturer or vendor, and is not the product of the plaintiff.

The evidence shows cases of actual deception, as well as a liability to such deception, and it also shows a particular kind of product attaching to the personality of the maker. George G. Fox Co. v. Glynn, 191 Mass. 344, 78 N. E. 89, 9 L. R. A. (N. S.) 1096, 114 Am. St. Rep. 619, and George G. Fox Co. v. Hathaway, 199 Mass. 99, 85 N. E. 417, 24 L. R. A. (N. S.) 400, are much in point. In these cases the plaintiff was the first to manufacture a particular kind of bread, using in it milk and malt, and applying to it, as a trade-name, the word "Creamalt." The bread was made in an oval loaf, unusual in shape and size, and having a peculiar broken and glazed surface, so as to produce an odd visual appearance. This combination of external characteristics was neither

economical nor necessary, and nothing similar was in use by defendants. The defendants then began to make similar bread, calling it "Crown Malt," and imitating the size and form of the loaf, and then also, with a slight difference, the peculiar appearance of the surface, and a label resembling that used by the plaintiff was attached to the loaf. A band was put around the loaf by both plaintiff and defendant; the former calling his product "Fox's Creamalt," and the latter naming his "Hathaway's Log Cabin Bread." This band was easily removable by retail dealers. It also clearly appeared that the defendants' legitimate business could be conducted properly without giving its wares this distinctive misleading appearance. It was held in the Glynn Case that the plaintiff was entitled to an injunction for the reason that in a suit in equity by one wholesale dealer against another to restrain unfair competition and trade, consisting of an imitation of the plaintiff's tradename and of the appearance of his goods, it is no defense that the defendant does not mislead, or intend to mislead, the retail dealers to whom he sells, if he knowingly places in the hands of the retail dealers an instrument of fraud with which they may deceive the public. In delivering the opinion of the court, Chief Justice Knowlton (191 Mass. 349, 350, 78 N. E. 89, 91 [9 L. R. A. (N. S.) 1096, 114 Am. St. Rep. 619]) said:

"But goods often come to be known as of a particular manufacture, and acquire a valuable reputation, by means of a designation that could not be made the subject of a trade-mark, because others may have occasion to make some use of the words or marks chosen. It is important to every one who has acquired a valuable good will in his business in that way, to have it protected, as his other property is protected. *It is also important to the public to be able to recognize articles of manufacture as produced by a known and trustworthy maker, through the appearance by which they have come to be known.*"

In the Hathaway Case the facts relied upon by the plaintiff to prove its case were substantially as they were stated in the Glynn Case, although it was claimed by the defendants that their loaf was without the label, and was therefore easily distinguished from the plaintiff's loaf, inasmuch as the two loaves were conspicuously distinguished by their labels. A small label bearing the name "Creamalt" was pasted upon the plaintiff's loaf, and a broad paper band bearing the names "Hathaway's Log Cabin Bread, Malted," encircled the defendant's loaf. It was held that the principles which were stated in the Glynn Case were applicable, and that the use by the plaintiff of the combination of the size, shape, color, and conditions of the surface to produce a general visual appearance for its loaf of bread made in part of malt and milk, gave it substantial rights, particularly as there were no intrinsic advantages in the combination which produced this general visual appearance, and that a very different general appearance would be just as advantageous to the defendants, unless they wished, by deceit, to get away the plaintiff's customers. In the opinion (199 Mass. page 102, 85 N. E. page 418 [24 L. R. A. (N. S.) 400]) the court said:

"The plaintiff had no exclusive right in any one of the features of the combination, and if the defendants had acquired the use of this combination for the successful prosecution of their business, they would have had a right

to use it, by taking such precautions as would prevent deception of the public and interference with the plaintiff's good will. But the evidence shows that the defendants had no occasion to use this combination, and therefore they were not justified in producing an imitation of the plaintiff's loaves, the natural effect of which would be to deprive it of a part of its trade through deception of the public. There are numberless shapes and sizes in which loaves of bread may be produced, and various peculiarities of appearance in color and condition of surface. These that the defendants adopted had been combined to distinguish the plaintiff's Creamalt bread, and it was the duty of other manufacturers to recognize this fact. Not, indeed, to the abandonment of their right to do what was reasonably necessary to success in the management of their own business; but to the extent of so conducting their business as not unreasonably and unnecessarily to interfere with the plaintiff's business through deception of the public."

If the shape and form of the plaintiff's product, and which the defendants have copied, were purely functional (that is, if they had certain elements of value for use and sale, which were peculiar to that form), a different question would be presented; but no such condition or features attach to the plaintiff's or defendants' product, and, as has been pointed out, the form of the biscuit made by the plaintiff was, at the outset, a matter of accident, and, indeed, a much more convenient form could have been chosen.

[8] The vital question here—as in all cases of like kind—is not whether dealers are liable to be deceived in buying from the manufacturer or wholesaler, but whether the user is liable to be misled in buying from the retailer. This distinction is well borne out and sustained by the Circuit Court of Appeals for this circuit in Enterprise Mfg. Co. v. Landers, Frary & Clark, supra; Yale & Towne Mfg. Co. v. Alder, 154 Fed. 37, 83 C. C. A. 149; Rushmore v. Manhattan Screw & Stamping Works, 163 Fed. 939, 90 C. C. A. 299, 19 L. R. A. (N. S.) 269; Rushmore v. Badger Brass Mfg. Co., 198 Fed. 379, 117 C. C. A. 255; Rushmore v. Saxon, 170 Fed. 1021, 95 C. C. A. 671; and by Mr. Justice Bradley in Putnam Nail Co. v. Bennett (C. C.) 43 Fed. 800, in an opinion which is quoted from with favor by the Supreme Court in Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U. S. 537, 549, 11 Sup. Ct. 396, 34 L. Ed. 997. Another well-considered and instructive case sustaining this view is Banzhaf v. Chase, 150 Cal. 180, 88 Pac. 704.

[9] The evidence shows sales by the Humphrey Cornell Company of a very small amount of the defendants' product, on which the profits were negligible. Although the plaintiff would be entitled to an accounting to recover, not only the amount equivalent to defendants' profits, but also any losses to its own business resulting from the unfair competition, if such losses could be shown, I am inclined to the view that the profits and damages together will be too small to justify the expense of taking an account, and upon the authority of Saxlehner v. Eisner & Mendelson Co. (C. C.) 88 Fed. 61, and National Distilling Liquor Co. v. Century Liquor & Cigar Co., 183 Fed. 206, 105 C. C. A. 638, there will be no reference to a master.

After oral arguments and submission of briefs, counsel for defendants further cite Miller Rubber Co. v. Albert Behrend et al., 242 Fed. 515, —— C. C. A. ——, decided by the Circuit Court of Appeals for the Second Circuit in February, 1917, and reported in the New York Law

Journal under date of March 10, 1917, and Diamond Expansion Bolt Co. v. U. S. Expansion Bolt Co., 164 N. Y. Supp. 433, decided by the Appellate Division of the Supreme Court of the state of New York, reported in New York Law Journal under date of April 23, 1917; but the cases cited are in no way inconsistent or in conflict with the conclusions herein reached.

Let an injunction issue in accordance with the views herein expressed. Decree accordingly, together with costs.