SPANGLER CANDY COMPANY,
Plaintiff-Appellant,

v.

CRYSTAL PURE CANDY COMPANY,
Defendant-Appellee.

SPANGLER CANDY COMPANY,
Plaintiff-Appellee,

v.

CRYSTAL PURE CANDY COMPANY,
Defendant-Counterclaimant-
Appellant.

No. 14918-9.

United States Court of Appeals
Seventh Circuit.

Dec. 6, 1965.

Rehearing Denied Jan. 11, 1966.

George B. Christensen, Chicago, Ill., for Spangler.

Dean A. Olds, Chicago, Ill., for Crystal Pure.

Before HASTINGS, Chief Judge, and DUFFY and KILEY, Circuit Judges.

DUFFY, Circuit Judge.

Plaintiff sought injunctive relief and an accounting for profits and damages allegedly occasioned by trademark infringement and unfair competition. Defendant counterclaimed seeking injunctive relief, damages and attorneys' fees for alleged unfair competition, asserting that plaintiff had issued unfair press releases and had threatened defendant's customers with involvement in the pending litigation.

The District Court held that the plaintiff's copyright had not been infringed and that the defendant had not engaged in unfair competition. The District Court also held there had been no unfair competition as alleged in defendant's counterclaim and the counterclaim was dismissed.

Both plaintiff and defendant manufacture lollipops which, in this record, are often referred to as "suckers." Lollipops are a hard candy made in various flavors and molded on the end of a stick which is made of wood or strongly compressed paper.

In 1953, plaintiff entered the lollipop business by purchasing from another company the necessary machinery and the trademark Dum-Dums. This trademark had been registered in 1924. Since 1953, plaintiff continuously has marketed its suckers under the Dum-Dums mark.

For years, suckers were usually sold individually in the stores. With the coming of supermarkets, package sales of suckers became predominant. By 1960, plaintiff's "29¢ supermarket bag" alone accounted for almost 50% of its sucker sales.

Customers at supermarkets usually wait upon themselves. In the candy section of a modern supermarket there may be displayed three or four brands of suckers. Many times candy customers

are accompanied and influenced by their children, some of whom may not be old enough to read. "Impulse buying" is often the basis for the selection which is made.

Lollipop manufacturers have attempted to identify their products by decorating the labels. The suckers are usually individually wrapped in either clear or colored cellophane. However, plaintiff used colored wax paper. Plaintiff was the only manufacturer making a ball-shaped and banded penny lollipop using wax paper wrappers and offering self-liquidating premiums.

Plaintiff's sales of suckers, marked and dressed as hereinbefore described, rose from 61,593,000 in 1953, to 286,182,000 in 1959, the last full year before defendant's accused acts. Of the 1959 sales, approximately 119,000,000 were made in the so-called "29¢ supermarket bag." Testimony of supermarket and drugstore operators established there was a steady consumer demand for Dum-Dums suckers.

For many years, defendant had marketed suckers of various shapes and sizes under various brand names. In 1954, it had registered the trademark "Tot Pops." However, in the late 1950's, defendant's leading brand was "Kiddie Pops."

Jewel Tea Company was an important customer of defendant. In the spring or summer of 1959, it transferred its lollipop business to plaintiff. Defendant's managing partner, Abbey, testified— "Well, I felt that if a good customer of mine thought that that was a good item to handle, I should put it in my line since I made nothing but pops."

Abbey sat down with one of plaintiff's packages before him as well as certain other packages. He frankly testified he tried "to get as close to [plaintiff's] as I thought good ethics and good taste would allow me to." Abbey's endeavor to have his package look like plaintiff's is shown by the copying of errors which occurred on plaintiff's package. Plaintiff had printed "Save Wraps" on its bags, but "Save Wrappers" on the labels. This error was copied exactly by Abbey.

Abbey sent one of plaintiff's suckers to a candy mold maker so that the mold maker could design a mold which would duplicate the form of plaintiff's product. He devised a new trademark. Abbey designed a wrapper with plaintiff's wrapper before him, and substituted the words "Pop-Pops" for "Dum-Dums."

Abbey then devised the decoration for an outer polyethylene bag nearly the identical size of plaintiff's, and used shades of colors as in plaintiff's outer bag. He used slogans on the bag almost identical with those used by plaintiff. One side of defendant's bag was printed vertically and the other horizontally, just as was plaintiff's. About the only place where defendant differed from plaintiff's color scheme was that plaintiff's name was printed in deep blue against the clear polyethylene background where plaintiff's name could be easily read, while defendant's name was printed on opaque white and was not so readily discernible.

Hence almost every element which Abbey put into his new sucker, mark and dress save the word "Pop-Pops" was borrowed without consent, from plaintiff. It would seem to be an unusual example of "good ethics" and "good taste."

█ There was no evidence of confusion, or confusing similarity, between the numerous competing suckers until the advent of defendant's accused mark and dress. Subsequently, there was proof of instances of actual confusion. One instance was—Mrs. Robert Smith was a Sunday School teacher who was familiar with Dum-Dums. She went to a supermarket in Georgia where she had previously purchased Dum-Dums in order to obtain a package of suckers to be distributed to her Sunday School class. She asked the assistant manager for Dum-Dums and he brought her a bag and laid it on the counter. After glancing at it, Mrs. Smith paid for it, took it home and thereafter distributed the contents to the children. Her brother-in-law, who was one of plaintiff's distributors and whose

children were, apparently, in the class, telephoned Mrs. Smith chiding her for giving his competitor's product to the children. She replied—"I thought that I had Dum-Dums; I asked for Dum-Dums and it looked like Dum-Dums." There was other evidence of actual confusion. "There can be no more positive proof of likelihood of confusion than evidence of actual confusion." Standard Oil Co. v. Standard Oil Co., 10 Cir., 252 F.2d 65, 74, 76 A.L.R.2d 600.

Supermarkets did not customarily carry both Pop-Pops and Dum-Dums. The reason is the one assigned by the District Court, that one wrapped and packaged item could be substituted for the other. It is interesting to note that after defendant copied plaintiff's product, wrapping and dress, Jewel Tea Company dropped plaintiff's Dum-Dums and substituted Pop-Pops.

## ALLEGED TRADEMARK INFRINGEMENT

The test for establishing trademark infringement was stated by this Court nearly forty years ago in Northam Warren Corp. v. Universal Cosmetic Company, 7 Cir., 18 F.2d 774, 775, and reaffirmed in Independent Nail & Packing Company v. Stronghold Screw Products, Inc., 7 Cir., 205 F.2d 921, 924, and National Van Lines, Inc. v. Dean, 7 Cir., 288 F.2d 5, 9, as follows: "It is sufficient if one adopts a trade name or a trade-mark so like another in form, spelling, or sound that one, with a not very definite or clear recollection as to the real trade-mark, is likely to become confused or misled."

### The Marks in Issue

Plaintiff is owner by 1953 assignment of federal trademark registration 203,637 covering the following trademark, for lollipops:

Defendant is owner of federal trademark registration 738,759, issued to it October 2, 1962 for the following trademark, for candy confection on a stick:

Plaintiff claims that defendant copied precisely the type font and logo of its mark. However, the District Court held the defendant's mark does not resemble the plaintiff's mark so as to be likely to confuse or to deceive purchasers. The Court stated that plaintiff's mark cannot be dissected, but should be viewed

as a whole and emphasized that the sounds of the words in the marks are different, in contrast to the words "Dramamine" and "Bonamine" which were held to infringe in G. D. Searle & Co. v. Chas. Pfizer & Co., 7 Cir., 265 F.2d 385.

█ We agree with the District Court that the claim of trademark infringement has not been sustained.

### UNFAIR COMPETITION

In most of the unfair competition cases which have come before this Court, the cause of action has arisen in Illinois, and we have held that Illinois law was to be applied. In Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 113, 59 S.Ct. 109, 83 L.Ed. 73 (Note 1), Justice Brandeis, speaking for the Court, it was pointed out that the doctrine of Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, makes state law controlling in unfair competition litigation brought in the federal courts under diversity jurisdiction. The instant case comes within that category.

When this case commenced, plaintiff claimed relief from product simulation by defendant in making its Pop-Pops suckers identical in shape and appearance with plaintiff's Dum-Dums product. Plaintiff's suckers were not a mere ball, but a banded ball which defendant copied precisely. Subsequently, the Supreme Court handed down its decisions in Sears, Roebuck & Co. v. Stiffel Company, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661, and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed. 2d 669. In view of these decisions, plaintiff has conceded it is not entitled to protection with reference to the shape of its suckers.

Prior to the Supreme Court's decisions in Sears and Compco, this Court had taken a dim view of the chiseling tactics of predatory and unscrupulous business competitors such as deliberately copying the product, dress and packaging of a successful competitor. Originally, we may have been influenced by the Second Circuit's opinion in My-T Fine Corp. v. Samuels, 69 F.2d 76, 77, where Judge Learned Hand wrote for the Court—"But when [intent] appears we think it has an important procedural result; a late comer who deliberately copies the dress of his competitor already in the field, must at least prove that his effort has been futile. * * * [S]uch an intent raises a presumption that customers will be deceived."

The view we held was well expressed by Judge Yankwich in 32 Notre Dame Law, 438, 468: "By using the concept of unfair practices, the courts have not sought to evolve absolute formulas. Rather, they have considered each case on its separate facts and have sought to apply to specific situations, flexible principles of equity aimed at fostering higher ethical business practices. * * * "

In any event, we endeavored to apply state law which usually was Illinois law. We understood Illinois law attempted to promote fairness and equity among business competitors. It was our view that under Illinois law, the principles of old-fashioned honesty were controlling. Jewel Tea Company v. Kraus, 187 F.2d 278, 282; Radio Shack Corp. v. Radio Shack, Inc., 180 F.2d 200, 206; Independent Nail & Packing Co., Inc. v. Stronghold Screw Products, Inc., 205 F.2d 921, 924. We understood that Illinois law recognized a social interest in prohibiting unfair and deceptive trade practices. We thought the effective prevention of fraud in cases before it was one of the high responsibilities of the judiciary.

Relying on Sears and Compco, defendant herein asserts that "a defendant may legally copy a plaintiff's article of manufacture and/or wrapper and package, which are not covered by a valid patent or copyright, slavishly down to the minutest detail and to the extent of making a 'Chinese copy' thereof, and such copying is not unfair competition, where the defendant does not represent himself as the plaintiff in the sale of such articles or palm off the articles as the plaintiff's product."

Whatever the Supreme Court did decide in Sears and Compco, these decisions have caused widespread comment. Numerous law review and other articles have been published discussing the decisions. Milton Handler, Professor of Law at Columbia University and a legal author of note, commented that " * * * for a century and three quarters it has not even as much as been intimated that state law must conform to the implied policy postulates which the Court for the first time discerns in the federal patent laws." [1]

Walter J. Derenberg, Professor of Law at New York University Law School, in stating that it was not necessary in Sears and Compco to formulate any over-all general law, said "Such a rule * * * would send to its demise a vast body of law that had been originally established by our federal courts, including the Supreme Court, long before these decisions became part of a 'distilled' state law of unfair competition." [2]

We are frank to state that it never occurred to us that the provision in the United States Constitution—"To promote the progress of Science and useful Arts, by securing for limited times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries"—(U.S.Const. Art. I, Section 8), and the patent laws passed by Congress to implement this constitutional provision, could be the vehicle which would be used to prohibit a state from preventing any, if not all, of the predatory business practices to which we have referred.

In Sears and Compco, the Court held that the federal patent laws had established a policy of competition which gives all competitors the right to appropriate any unpatented commercial products in the public domain and that federal policy prevents the states from protecting property rights in such competitive products. It would appear that little or no relief is now available in the case of product simulation.

It would seem that the free and unrestricted copying of a competitor's product may not, at times, result in increased competition. A large manufacturer might appropriate to himself a clever and original commercial idea originated and used by a small-sized competitor, and by means of such appropriation, put the small concern out of business.

Plaintiff strongly urges that the candy itself is no longer an issue in this case, but that we are now concerned only with packaged candy as it reaches the customer.

In Sears, 376 U.S. at page 232, 84 S.Ct. at page 789, the Court stated:

" * * * Doubtless a State may, in appropriate circumstances, require that goods, whether patented or unpatented, be labeled or that other precautionary steps be taken to prevent customers from being misled as to the source, just as it may protect businesses in the use of their trademarks, labels, or distinctive dress in the packaging of goods so as to prevent others, by imitating such markings, from misleading purchasers as to the source of the goods. * * *"

In Compco, 376 U.S. 234, at page 238, 84 S.Ct. 779, at page 782, the Court stated:

"As we have said in Sears, while the federal patent laws prevent a State from prohibiting the copying and selling of unpatented articles, they do not stand in the way of state law, statutory or decisional, which requires those who make and sell copies to take precautions to identify their products as their own. A State of course has power to impose liability upon those who, knowing that the public is relying upon an original manufacturer's reputation for quality and integrity deceive the

---

[1]. In a symposium, Product Simulation: A Right or a Wrong? 64 Colum.L.Rev. at 1178, 1190.

[2]. In the same Symposium, 64 Colum.L.Rev. at 1204 (1964).

public by palming off their copies as the original. * * *"

Thus, the Supreme Court has indicated in Sears and Compco that a state still retains power, by statutory or decisional law, to protect the consumer from confusion resulting from the copier's palming off its product as the original.

Undoubtedly, different courts will have different ideas as to just what area is left for the states to protect their citizens from predatory business practices. Since Sears and Compco, the Second Circuit has considered a trademark infringement case where unfair competition was claimed. The Court applied the law of New York. The term "Flexitized" was coined by plaintiffs for a flexible collar stay. The Court held that plaintiffs were the victims of unfair competition notwithstanding the fact that plaintiffs' mark had not acquired a secondary meaning as to either source or quality. The Court said relief in New York had been granted in a wide variety of situations to insure that "one may not misappropriate the results of the skill, expenditures and labors of a competitor." The Court specifically noted "We do not read the recent United States Supreme Court decision in Sears, Roebuck & Co. v. Stiffel Co. * * * as establishing any constitutional bar to the application of state law in the instant case. * * *" Flexitized, Inc. et al. v. National Flexitized Corp. et al., 335 F.2d 774 at 781.

The District Court below held that no secondary meaning had been shown by plaintiff, and that there had been no "palming off" of defendant's product as that of the plaintiff. The Court was, apparently, of the view that evidence of actual confusion could come only from wholly disinterested ultimate consumers.

■ While determination of credibility is a function of the trier of facts, yet, it would seem the District Court adopted an impermissible yardstick. Simply because a witness may be connected in some way to a party in a law-suit does not mean the witness cannot tell the truth on the witness stand while under oath. The Sunday School teacher's testimony was, apparently, discredited because she had a brother-in-law who was a distributor of plaintiff's product. Also, apparently discredited, was Havlik, a manager of an independent retail store; Cohen, an independent candy jobber; Gerenstein and Gatehouse, two brokers who admitted they were not on friendly terms with plaintiff.

■ To establish secondary meaning, it is not essential that the retail customer know the manufacturer's name of the product which he desires to buy. As Judge Learned Hand said in the famous shredded wheat case [3]—"The plaintiff has at least shown that the public has become accustomed to regard its familiar wheat biscuit as emanating, if not from it by name, at least from a single, though anonymous, maker, and the second is as good for these purposes as the first."

■ The generally accepted rule is well expressed in Nims on Unfair Competition and Trade-Marks, 3rd Ed., page 121: "Secondary meaning may exist between a name and a manufacturer or seller whose identity is not known to the buyer, as well as between a name and a manufacturer or dealer who is known to the consumer. There are many specific articles which are constantly asked for by brand name. The buyer seeks the product of some one particular concern. He does not know its name, or its location, or whether it is a corporation or an individual. He only knows he seeks a particular thing known by a name familiar to him. * * *"

The Supreme Court tells us in Sears, that a state may require that goods, whether patented or unpatented, be labeled, or that other precautionary steps be taken to prevent customers from being misled as to the source. Also, that a state may protect businesses in the use of their distinctive dress in the packaging of goods so as to prevent others by

---

3. Shredded Wheat Co. v. Humphrey Cornell Co., D.C., 250 F. 960, 963, which mod. & affd. 244 F. 508.

imitating such markings from misleading purchasers as to the source of the goods.

There is no pertinent labeling law in Illinois. Furthermore, self-service merchandising suggests labeling may often not be sufficient to protect against consumer confusion.

There was considerable evidence in the record that many switches in purchases from Dum-Dums to Pop-Pops were caused by the lower price at which Pop-Pops were sold. In spite of the impermissible yardstick apparently used as to some witnesses' credibility, we recognize there is substantial evidence in the record to support the District Court's findings that there was no sufficient secondary meaning or palming off shown by plaintiff to meet the exacting tests laid down in the Sears and Compco cases.

We are also of the view that the District Court was correct in holding that no unfair competition had been proved as alleged in defendant's counterclaim, and that the counterclaim was properly dismissed.

Judgment affirmed.