**BECONTA, INC., a New York corporation, Plaintiff,**

v.

**LARSON INDUSTRIES, INC., a Minnesota corporation, Defendant.**

No. 71 C 625.

United States District Court,
N. D. Illinois, E. D.
March 18, 1971.

R. Howard Goldsmith, Marshall W. Sutker, Dressler, Goldsmith, Clement & Gordon, Chicago, Ill., for plaintiff.

Malcolm Bradway, Thomas F. Mc-Williams, Mann, Brown & McWilliams, Chicago, Ill., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT ORDER

McGARR, District Judge.

The plaintiff, Beconta, Inc., is a New York corporation that has filed an action for trademark infringement and unfair competition against defendant Larson Industries, a Minnesota corporation. Plaintiff sells skis; plaintiff and defendant are both established names in the ski industry and were recently exhibitors at a ski show at McCormick Place in Chicago, Illinois.

On March 4th, 1971, the plaintiff alleges, that he became aware that the defendant was showing a ski for sale with a striated design mark confusingly similar to that being used by the plaintiff. Plaintiff seeks a temporary and permanent injunction as to the sale of skis with the striated design and an accounting for damages suffered, and asks that the defendant be required to deliver up for destruction all skis and written material with the confusing design contained therein. Plaintiff additionally had asked for a temporary restraining order on the eve of the ski show; which application was denied for want of a sufficient showing.

Hearing has been had on the complaint of Beconta, described above, against Larson Industries which does business in the ski area under the name Northland, in which Beconta seeks a preliminary injunction against defendant Larson, prohibiting the further promotion and sale by Northland of a ski which it is claimed copies the unique zebra design of the Beconta ski which has been on the market since 1968.

I find from the evidence that the plaintiff Beconta is the exclusive distributor in the United States of a brand of skis manufactured in Germany by the Volkl Company. Since 1968, Beconta has concentrated a great portion of its promotional activity on a single ski from among the variety of skis in its line. This ski, known as the Zebra, is distinguished by an unusual and striking pattern of transverse stripes of varying width in a chevron-type configuration covering most of the top surface of the ski. The point of the chevron is toward the tip of the ski on the forward half and toward the tail of the ski in the area behind the bindings. This same design distinguishes two other skis in the Beconta line called the Tiger and the Sapporo. A variety of other skis in the Beconta catalog bear designs which in no way resemble the zebra pattern described above. Throughout the trial, the various witnesses referred to this external design and appearance of skis as the cosmetic of the ski, as distinguished from features involving construction and materials.

While catalogs and advertisements in evidence depict skis manufactured or distributed by a variety of companies, and reveal a great variety of patterns and colors, the zebra design stands out among these as a unique and distinctly recognizable design.

Some time in 1970, as part of the preparation of the line of skis to be offered to the trade for the 1971 winter season, the Northland Company designed and

put into production in Japan a ski known as its model GT–2000, which ski was displayed to wholesale buyers for the first time at a ski show at McCormick Place Amphitheater in Chicago, commencing Friday, March 12th. On or about Thursday, the 11th of March, plaintiff Beconta learned of the existence of the GT–2000. The evidence indicates that the McCormick Place show is the first of four or five exhibitions around the country at which manufacturers or distributors display their skis and related equipment to the trade, and take orders for the 1971 winter season, usually for delivery in the late summer. The evidence further shows that the Northland Company has commissioned the manufacture of approximately 4,000 pairs of the GT–2000 skis from a plant in Japan, at a cost to Northland delivered in the United States of about $28 a pair. No evidence was introduced to indicate the number of orders for the GT–2000 taken at the McCormick Place exhibition. At the same exhibition a variety of additional Northland skis were offered to the trade, approximately 12 in number, in various price ranges and of varying types of construction. None of the other Northland skis were in the identical price range with the GT–2000, the closest being the GT–1000 of similar material and construction at the price of $49, while the GT–2000 is priced at $60. Uncontradicted evidence of a plaintiff's witness was to the effect that the skis already manufactured could be re-worked to substitute a different cosmetic design at an estimated cost of two to three dollars per pair.

I find that the Beconta Company has, in all of its promotion of the Zebra ski—which it has distributed since 1968—emphasized the unique zebra design, and I find further that because of the uniqueness of the design, and the promotion of this uniqueness in the advertising of Beconta, the striated or zebra design has become associated with the name Beconta. This design further has assumed in the mind of the ski-buying public an identity with an expensive, high-quality ski with overlying connotations of expertise and knowledgeability in the world of skiing on the part of those who own Zebras. The Zebra ski, to use a slang expression which the witnesses have used, is a "hot" ski, and the persons buying it, in addition to choosing the Zebra ski for its quality and performance characteristics, are tending to reinforce their own image as hot skiers.

Gerald Groggen, a vice president of defendant Larson, and in charge of the Northland division of that company, testified to the preeminence of Northland in the field of ski equipment and the large volume of its sales. He mentioned $2,200,000 gross sales for skis alone, exclusive of bindings and poles. He testified further that he, together with a Japanese designer, was responsible for the cosmetic design of the GT–2000, and that before executing this design, he was familiar with the Beconta Zebra ski and the zebra design used on this and two other skis in the Beconta line. I find as a matter of fact that the cosmetic design and external appearance of the GT–2000 is markedly similar to the design and appearance of the Beconta Zebra ski, and that absent the opportunity for side-by-side comparison and based on appearance alone, one would almost inevitably be mistaken for the other. Therefore, I find a strong likelihood of confusion in the minds of the buying public between the two products. This is true despite the fact that the Zebra is a high-priced ski at $200 and the GT–2000 is in a much lower price range at $60.

Beconta has filed a trademark application for the zebra design which was originally challenged by the examiner, but after a showing that the zebra design had acquired a secondary meaning, publication of this application was authorized in the principal register. At the time of hearing, this was as far as this application had progressed. No similar application has been filed for any cosmetic design on any other skis distributed by Beconta except the three bearing the unique zebra pattern. This case, therefore, is not predicated

upon the assertion of a federal trademark right, federal jurisdiction being rather the result of diversity of citizenship.

■ I find that the Beconta Company has a cognizable interest in a unique design which, through its diligent promotion and advertising, has become identified in the minds of the ski-using public and the ski industry with the Zebra ski and the Beconta Company, and that the plaintiff has a right in this design which deserves the protection of this court against unfair competition practices. I find further that the GT–2000 ski distributed by defendant Northland is sufficiently identical in design with the Zebra ski to confuse the ski-buying public with resultant damage to Beconta.

Plaintiff has made a showing of irreparable harm in that, upon the allowance of sale to the trade and wide distribution to the buying public of the GT–2000 ski, it will become virtually impossible to determine what retail purchasers were exercising a knowledgeable choice between competing skis and what purchasers were the victims of the confusion which the identical design will inevitably produce. This factor results in the conclusion that if the Northland Company is allowed to sell and distribute the GT–2000, Beconta will not only suffer irreparable injury, but will have no adequate remedy at law. In addition to the inadequacies of the legal remedies, Beconta will suffer a diminishing of the elite image which it has created for the Zebra ski by introduction into the market of a ski readily confused with it at a much lower price. While it is true that the construction and materials of the two skis are markedly different, this fact is not apparent from the external appearance of the skis and, therefore, is not apparent to any but the highly knowledgeable ski purchaser.

An injunction against the sale of the GT–2000 will undoubtedly work hardship upon Northland, although the hardship will be substantially less than if, after another full season of distribution and sale, plaintiff is found to have been entitled to damages. Further, Northland is a large and solvent company with other skis to offer the public and the means to re-work the existing skis to change their appearance. In balance, therefore, it cannot be said that the issuance of a preliminary injunction against Northland will be disproportionately inequitable.

■ This Court has jurisdiction over the parties by virtue of their diversity of citizenship. I take cognizance, also, of the general principles of law that the person who first employs a trademark—and I use this in a common law sense—in connection with a particular class of goods acquires a right in that trademark, enforceable by the courts in furtherance of the protection of the public against confusion at the point of purchase. The right of the user of a trademark may be statutory but there also exists a right under the common law based on prior exclusive appropriation and use. In support of that I note the Mantle Lamp Company of America v. Aladdin Manufacturing Company (7th Cir. 1935) 78 F.2d 426.

Since the trademark application being processed in this case is not complete, the federal trademark laws are not involved. The case must be considered solely under the common law principle of unfair competition and the question is whether this Court has power to enjoin activities furthering such unfair competition.

Because the evidence indicates the only sales thus far made of the GT–2000 ski were made at the show recently concluded in Illinois, the Illinois law is pertinent as to these sales, at least, and any relief that may be granted concerning them.

The Illinois statutes, Smith-Hurd Annotated, Chapter 140, Section 22, provides the remedy of injunction to prevent the use by another of a similar mark or label if there exists the likelihood of dilution of the distinctive quality of the mark, a circumstance which the Court has found exists in this case. This Illinois statute could not be the basis for a general nationwide injunction, but I cite

it as illustrative of a state law which the Court could apply as a partial solution to the problems raised by this case. But before a determination of the power of this Court to provide equitable relief to the plaintiff in this case, notice must be taken of the decision of the United States Supreme Court in the two cases, Sears, Roebuck & Company v. Stiffel, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661, and Compco Corporation v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669. These cases at first reading seem to suggest that the existence of the constitutionally mandated authority of the United States in the area of patents, trademarks and copyright preempt this field, with the result that all rights under the patent, trademark or copyright laws are cognizable in Federal Courts alone, and that without an assertion of rights under these laws, no cause of action exists, either in the State Court or the Federal Court.

It is difficult to assume that the United States Supreme Court intended by these decisions to remove from the states and their courts all power to deal equitably with traditional concepts of unfair competition, and equally difficult to assume that the decisions were intended to deprive the Federal Courts of the power to apply time-honored principles of the law of unfair competition to litigants before the Federal Court by virtue of diversity of citizenship.

The Seventh Circuit, in Spangler Candy Co. v. Crystal Pure Company, 7 Cir., 353 F.2d 641 (1965), found that the combination of the Sears and Compco cases drastically reduced the area of relief available in the Federal Courts in product simulation cases, but did not foreclose it entirely. The Seventh Circuit quoted extensively therein from both the Sears and Compco cases in language reaffirming, in the view of the Seventh Circuit, the right of the state, in appropriate circumstances, to require that goods be properly labelled or otherwise— citing the authority of the Court—to protect businesses in the use of their labels or designs in the packaging of goods, so as to prevent others, by imitating such markings, from misleading purchasers as to the source of their goods.

In this decision, the Seventh Circuit said, and I am quoting:

"Thus, the Supreme Court has indicated in Sears and Compco that a state still retains power, by statutory or decisional law, to protect the consumer from confusion resulting from the copier's palming off its product as the original.

"Undoubtedly, different courts will have different ideas as to just what area is left for the states to protect their citizens from predatory business practices. Since Sears and Compco, the Second Circuit has considered a trademark infringement case where unfair competition was claimed. The Court applied the law of New York. The term 'Flexitized' was coined by plaintiffs for a flexible collar stay. The Court held that plaintiffs were the victims of unfair competition notwithstanding the fact that plaintiffs' mark had not acquired a secondary meaning as to either source or quality. The Court said relief in New York had been granted in a wide variety of situations to insure that 'one may not misappropriate the results of the skill, expenditures and labors of a competitor.' The Court specifically noted 'We do not read the recent United States Supreme Court decision in Sears, Roebuck & Co. v. Stiffel Co. * * * as establishing any constitutional bar to the application of state law in the instant case. * * *' Flexitized, Inc. et al. v. National Flexitized Corp. et al., 2 Cir., 335 F.2d 774 at 781."

There remains, therefore, in the equitable power of this Court some power to prevent, in this case, the misleading of purchasers by the creation of confusion as to the source and quality of skis being offered for sale. This power must be exercised in whatever manner the circumstances and facts of this case justify. This is another way of saying that

within the limits of Sears and Compco, there remains in this Court some power in equity and law to enforce the traditional principles of the common law of unfair competition. The suggestion that emerges from Sears and Compco, which may not be the outside limits of this power, is that the Federal Courts utilizes this power, to prevent the confusion of the public by the requirement of some sort of labelling or modification of the appearance of the product as the way which was deemed acceptable in those cases, or at least in the dictum in those cases. I, for the moment at least, in the context of this ruling on an application for a temporary injunction, am taking that lead suggested by the Court in those cases.

■ The defendant Larson Industries, Inc. is temporarily enjoined from offering for sale, selling or distributing to the ski-buying public on either the wholesale or retail level, the ski designated as GT–2000, unless and until some modification of the cosmetic design of that ski or some label or other legend affixed to it clearly indicates to prospective purchasers that the GT–2000 ski is not the same as the Zebra ski and not a product distributed by Beconta. The parties are instructed to submit to the Court for its consideration and approval within five days some proposal for accomplishing this result.