**SALTON INCORPORATED, Plaintiff,**

v.

**CORNWALL CORPORATION et al., Defendants.**

**Civ. No. 77–197.**

United States District Court, D. New Jersey.

Aug. 17, 1979.

Morris M. Schnitzer, Newark, N. J., for plaintiff.

John A. Baldino, Irvington, N. J., Michael J. Reimer, Newark, N. J., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LACEY, District Judge.

## INTRODUCTION

Plaintiff, a New York corporation, sues the defendants, New Jersey corporations, for trademark infringement and unfair competition.[1] Jurisdiction lies in this court under 15 U.S.C. § 1121 and 28 U.S.C. § 1332. The matter was tried to the court without a jury and, in addition to the evidence, the court has had the benefit of the parties' posttrial submissions.

My Findings of Fact and Conclusions of Law follow:

## FINDINGS OF FACT

1. The plaintiff Salton, Incorporated (Salton), is a New York corporation, having its principal office at 1260 Zerega Avenue, Bronx, New York.

2. The defendant Hudson Standard Corporation (Hudson) is a New Jersey corporation, having its principal office at 90 South Street, Newark, New Jersey.

3. The defendant United Commercial Corporation (United) is a New Jersey corporation, having its principal office at 90 South Street, Newark, New Jersey.

4. The defendants were founded in 1970. Both are owned and managed by Theodore Pearlman and Calvin A. Giroux.

5. Hudson is a manufacturer and distributor of small electrical appliances. "Broil King" is a trademark owned by it.

6. United, in 1977, acquired tools and dies used by Cornwall Corporation (Corn-

1. The complaint as to Cornwall Corporation will be dismissed, and "Broil King" is not properly a defendant. It is a trademark of Hudson Standard Corporation, a remaining defendant along with United Commercial Corp., Inc.

wall), then bankrupt, for the manufacture of electric food warming appliances. These tools and dies were leased to Hudson.

7. Salton is one of the leading, if not the leading, manufacturer and distributor throughout the United States, in interstate commerce, of electric food warming appliances. It and its predecessor companies have been engaged in that business continuously from 1949 to date. Plaintiff's line of electric food warming appliances is marketed by about 4,000 retailers; upwards of 10 million such food warmers have been sold during the plaintiff's thirty-year history under the trade name "Salton," coupled with the trademark "HOTRAY," both of which appeared on the product, the containers and all related printed material; during the same time span, upwards of $5,000,000 has been spent directly by the plaintiff and through cooperative advertising of its retail dealers, all of which featured Salton HOTRAY, and which reached many millions of readers of newspapers and magazines such as The New Yorker and the Sunday magazines of the New York Times, the Los Angeles Times and other publications.

8. The plaintiff adopted "HOTRAY" as its trademark for warming trays, tables and carts, from the very outset of its business in 1949 and has used "HOTRAY" continuously in interstate commerce since then by affixing such trademark to its goods and featuring such trademark in its advertising in interstate commerce.

9. The trademark, "HOTRAY," was registered to Salton under the Lanham Act upon the Principal Register of the United States Patent Office on September 10, 1963, as # 756,336. The affidavits under Sections 8 and 15 of the Lanham Act, 15 U.S.C. §§ 1058, 1065, have been duly filed by Salton with the United States Patent Office. *See* Conclusion of Law 3.[2]

10. Theodore Pearlman, President, and a stockholder and director of Hudson, has been in the electric appliance business for many years. Before 1971, I find, he and his associate, Mr. Giroux, knew of the Salton food warmer line, marketed under the trademark "HOTRAY."

11. Retail Home Furnishings is a trade magazine which, in 1971, circulated in interstate commerce in the United States. The issues of January 10, 17, 18, and 31, 1977, carried Hudson advertisements, approved by the defendants, headlined "ELECTRIC HOT TRAYS" and, in illustration, two electric food warming appliances, one called "THERMO GLASS TRAY" and the other "ELECTRIC SERVER." Hudson placed this advertising with knowledge of Salton's trademark "HOTRAY."

12. Sales and promotional material, distributed by Hudson, in interstate commerce, on or about January 1977, referred to its electric food warming appliance as "hot tray."

13. The advertisements, sales and promotional material referred to were likely to cause confusion, or to cause mistake, or to deceive, and infringed the plaintiff's trademark "HOTRAY."

14. The said infringement was knowing and intentional; however, it appears that the advertisement was not disseminated to the consuming public, and that it was seen only by persons in the small appliance trade.

15. Hudson intends to advertise and to market its electric food warming appliances in interstate commerce, as "hot trays," and as "Broil King Hot Tray," unless enjoined by the court.

16. In January 1977 Salton filed a complaint in the United States District Court for the District of New Jersey alleging that "electric hot tray" infringed its trademark "HOTRAY" and that use of the phrase "electric hot tray" constituted unfair competition under the laws of New Jersey.

17. Hudson sent to its manufacturer's representatives catalog pages containing the term "hot tray" in the advertisement's text.

18. Upon receiving Salton's complaint, Hudson notified the manufacturer's representatives to destroy those catalog pages and replace them with substitutes.

---

2. Conclusion of Law 3 holds the trademark "HOTRAY" to be incontestable.

19. Hudson has not used the words "hot tray" since plaintiff filed suit.

20. The aforesaid Cornwall used the term "hot trays" in connection with the advertising and sale of its line of electric food warmers. Salton sued Cornwall for infringement in the United States District Court in the District of Massachusetts, Docket # 59–969–SCA. The case was settled by an agreement, dated March 28, 1960, under which Cornwall was prohibited from using the words "hot tray" in advertising, promotion, literature labels or the like, but allowed the use of the term "Hot Electric Tray."

21. The defendants contend the terms "Hot Tray" and "hot tray" are the generic name and the "common descriptive name," [as that term is used in 15 U.S.C. § 1065(4)],[3] of electric food warming appliances, and thus their use of "Hot Tray" and "hot tray" to describe their food warmer is not an infringement of plaintiff's "HOT-RAY."

22. I find that the plaintiff has proved by a preponderance of the credible evidence that the generic or common descriptive name for products of the type made and marketed both by Salton and Hudson is not "Hot Tray" or "hot tray" but rather "food warmers" or "electric food warmers."

In this respect, while mindful of his obvious interest in the outcome of the case, I find credible and accept the testimony of Mr. Salton, and its support in the form of the long and continued use of the term "food warmer" by plaintiff. Also persuasive on this issue is the evidence consisting of the Best Products catalog and the Hammacher-Schlemmer catalog reference. Thus, Hammacher-Schlemmer advertises the Salton product as "Salton HOTRAY Food Warmer."

To support its claim that "hot tray" and not "food warmer" is the generic or common descriptive term for the appliance involved, defendants called certain witnesses who testified they had heard consumers ask for "hot trays." This testimony is highly suspect and is rejected, upon the basis of the following analysis:

1. Lawrence Sanders: he testified that people in the trade used the term "hot tray" when referring to food warmers. However, it is not what those in the trade think or say; it is the consuming public to which we look in such matters. Moreover, given the widespread advertising of "HOTRAY" by Salton and its association with food warmers, the public, I find, will be led to ask for Salton food warmers by using the "HOTRAY" designation.[4] It might well be asked: If the consuming public did not pick up the designation from Salton, where could it have come from? Sanders conceded that no manufacturer other than Salton is using "HOT-RAY" or "hot tray." Indeed, the defendants themselves have not used the latter designation in any sales, advertising or promotional material going to consumers, and, as has been found, only briefly used the term "hot tray" in such materials which went to wholesalers and distributors. Aside from the foregoing analysis, moreover, I did not find Sanders to be a credible witness. His testimony reflected an obvious bias in favor of the defendants. As a salesman for G. A. Etlinger, a distributor of the Hudson Broil King products, including electric food warmers, this witness had an interest in the outcome of the case. Based upon these factors and his demeanor responses to questions, particularly upon

---

**3.** 15 U.S.C. § 1065(4) states: "[N]o incontestable right shall be acquired in a mark which is the common descriptive name of any article or substance, patented or otherwise."

**4.** This would, when spoken, easily be mistaken for "hot tray." As the proceedings in court demonstrated, phonetically "HOTRAY" and "hot tray" are indistinguishable. Defendants'

argument, based on the testimony of Messrs. Sanders, Solex and Rogoff, was that this meant that "hot tray" was like the "Lite" in *Miller Brewing Co. v. Heileman Brewing Co., Inc.*, 561 F.2d 75 (7th Cir. 1977), cert. denied, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978). This decision will be dealt with under my Conclusions of Law. *See* Conclusion of Law 9.

cross-examination, I must conclude that his testimony is rejected. Additionally, even if I had accepted it, I would have given it no weight.

2. James Solex: this witness, now employed as a small appliance buyer by Macy's, and formerly by Gimbels, testified that Gimbels carried the Salton and Hudson Broil King electric food warming appliances, the Salton line for many years and the defendants' food warmer only recently. He testified that customers asked for "hot trays." He confirmed that the Salton product had been stocked and advertised by Gimbels under the trademark "HOTRAY," which sounds exactly like "hot tray," and which is what the customers may have been seeking. I give this testimony no weight to the extent it was offered by the defendants to show that customers asked for a "hot tray" when what they wanted was a device that merely kept food warm and did not cook food. What I stated as to the Sanders testimony is equally applicable here: a customer asking for "HOTRAY" would have come to that by reason of Salton's millions of dollars of promotion of that mark. Not one consumer had been exposed to the term "hot tray" by the defendants' advertising and promotion. Instead, they had been informed of "food warmers." To the extent Solex testified, or would have us believe, that consumers were asking for "hot tray" rather than "HOTRAY," I reject the notion as unsupported by credible evidence.

3. Irving Rogoff: his testimony was substantially the same as Mr. Sanders and just as inconsistent with the testimony of Mr. Salton and the catalog listings, of the product in issue, by Best Products and Hammacher-Schlemmer, both of which list such products as "food warmers." Rogoff's testimony is subject to the same shortcomings. Moreover, this witness, as I observed him, had an obvious bias against the plaintiff. This might have resulted from the fact that he had previously been terminated by plaintiff as its distributor. I find this witness, based on the same analysis made as to the Sanders testimony, to be lacking in credibility, a conclusion I reach, as well, by my viewing his demeanor as he testified. Thus I reject his testimony. Even were I to accept it, however, it would, like the Sanders testimony (if accepted), be entitled to no weight for the same reasons stated in my analysis of the Sanders testimony.

The defendants also tendered certain trade advertising using the words "hot tray." Given the lack of adequate explanation by the advertisers and the few instances involved, I accord this evidence no weight.

23. To the extent that "HOTRAY" is descriptive of Salton's electric food warming appliances, it has become distinctive of these goods, [as that term is used in 15 U.S.C. § 1052(f)], through long use, wide advertising and large volume of sales of such products bearing Salton's name as manufacturer, and the trademark "HOTRAY," and at the time of registration and thereafter to date has acquired secondary meaning.

The consuming public is aware that the electrical food warming appliance whose name is pronounced "hot tray" comes from a single source. That is, in a store when consumers use the words "hot tray" when they ask for a food warmer by that designation, they are requesting Salton's "HOTRAY." The court reaches this conclusion in part because of the substantial advertising expenditures of Salton and its many years of marketing food warmers under that trademark. The effectiveness of the advertising and the result of the marketing was demonstrated by the testimony of the plaintiff's experts. Both experts, Henry Bakstad of Hammacher-Schlemmer and Laurence Hurd of Bloomingdale's Department Store testified that the advertising and promotion by Salton has created in the mind of the consuming public the belief that a "hot tray" comes from one manufacturer. This court finds the testimony of these experts to be credible, and it is accepted.

As I have hereinabove noted, the testimony of the defendants to the contrary is rejected as being, on its face, without weight and, to the degree mentioned, unworthy of belief.

Because defendants discontinued their offending advertising immediately, there have been no instances in evidence where Hudson's "electric hot tray" has been confused with Salton's "HOTRAY." Thus, the plaintiff has not demonstrated that actual confusion between the products has occurred. However, when "HOTRAY" is pronounced, it is aurally indistinguishable from "hot tray." Because of this phonetic equivalence, there is a likelihood that consumers asking for the "HOTRAY" product will be given Hudson's "hot tray." Thus, I find that there is a substantial likelihood that auditory confusion will take place if Hudson is permitted to call its food warmer "Hot Tray" or "hot tray."

24. The products are the same in function. The channels of distribution and sale are the same. There is a striking similarity in appearance of the marks, particularly when "Hot Tray" is within the defendants' materials as a caption, and phonetically the two are indistinguishable. The items are relatively low cost items which are not likely to trigger close consumer scrutiny. Finally, the defendants have a clear interest in palming off their product as that of the plaintiff.

25. The defendants' use of "Broil King Hot Tray," as contemplated by them, as well as their previous use of such term, is an infringement of Salton's trademark "HOTRAY."

■ 26. Defendants' use of the term "hot tray" in the lower case in the body of its literature is also an infringement. By widely publicizing, promoting and advertising the term "hot tray" for what is a food warmer, defendants rationally could have only one purpose—to compete with Salton's "HOTRAY." No other manufacturer of food warmers presently uses the term "hot tray." Thus, the defendants' usage could be directed only at Salton.

■ The defendants' argument that it must use the term "hot tray" if its food warmer is to be recognized as a food warmer is unacceptable. The "food warmer" listings in the Best Products and Hammacher-Schlemmer catalogs rebut and destroy that contention. They call it what it is, a food warmer. Moreover, the evidence reflects other manufacturers, as well, use the word "warming," in association with terms such as "electric" or "tray" to designate their food warmers. Beyond this, the defendants did not present evidence that their sales of food warmers had been adversely affected by their using terms other than "hot tray" in their literature. Indeed, inferentially, the evidence was to the contrary, given the fact that defendants had no difficulty in arranging distribution and store placement for its food warmer.

Accordingly, for the reasons set forth in this finding, and given the defendants' intention as I perceive it under all the circumstances, the use of "hot tray" in lower case, or as "Broil King Hot Tray" in caption or capital letters constitutes an unlawful infringement of plaintiff's trademark.

■ 27. Defendants' argument that their product is "hot" and is a "tray" and that they should thus be able to use the term "hot tray," while perhaps of some force under other circumstances, is rejected here. Unless the public is told, at some point in the sales literature, that the appliance is for keeping food warm, the true nature of the appliance is not revealed. Why, then, do defendants seek to use two words which, while they describe two features of the appliance, that it is "hot" and that it is a "tray," do not tell the consuming public the purpose of the appliance, to keep foods warm? This question becomes particularly troublesome when the defendants' advertising is viewed in its entirety. Predictably, the consuming public is told that this "hot tray" is to keep foods warm. It is not, like the "hot plate," to cook or boil; it is to maintain temperatures of foods. The term "hot tray" is, in fact, misleading as to

function, just as is the term "HOTRAY."[5] The term "hot tray" is descriptive of two physical features; it does not inform the consuming public of the purpose of the appliance.[6] As I have noted earlier, use of "hot tray" under these circumstances is designed to trade upon plaintiff's goodwill and is not justified simply because the appliance is capable of getting "hot" and is a "tray." *See Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976) and Conclusion of Law 8.

■ 28. Defendants' use of the term "Broil King Hot Tray" in caption or title, or otherwise prominently displayed, is the use of "Hot Tray" as a trademark. Their use of the term "hot tray" in lower case, in the body of their sales, advertising, and promotional material, is not, under the circumstances as I have found them and describe them, a fair use as such within the statutory meaning. *See* 15 U.S.C. § 1115(b)(4). Such use, whether in the caption or title, or in the text, is, I find, not required by any other purpose than to trade upon plaintiff's goodwill and to confuse the consuming public. Thus, such use cannot be said to be "fairly" done, or done in "good faith." *Id.*

29. The infringement by Hudson is also unfair competition.

30. The plaintiff has acted promptly and properly over the years to prevent the use of its trademark by others. In this connection, in addition to its suit against Cornwall, it has acted to warn others that its trademark would be enforced. No one thus warned continued to use "Hot Tray" or "hot tray" thereafter.

31. Defendants have not profited, as yet, by their infringement or unfair competition; since the inception of this action by plaintiff, defendants have refrained from using the term "Hot Tray" or "hot tray" pending the outcome of the case.

32. The plaintiff has not suffered cognizable damages.

33. Since I do not deem this an exceptional case, the plaintiff is not awarded counsel fees. *See* 15 U.S.C. § 1117. I do find, however, that under the circumstances of this case, plaintiff is entitled to counsel fees on its unfair competition claim. *See* Findings of Fact 26 and 27.

## CONCLUSIONS OF LAW

### *Jurisdiction*

■ 1. This is an action for infringement of a trademark registered upon the Principal Register under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, by the United States Patent Office. The court has jurisdiction under 15 U.S.C. § 1121.

■ 2. This is also an action for unfair competition. Given diversity of citizenship of the parties, and the jurisdictional amount having been met, this court has jurisdiction under 28 U.S.C. § 1332.

### *Incontestability*

■ 3. The plaintiff's trademark "HOTRAY" was "merely descriptive" but, having acquired secondary meaning, was properly registered and has become incontestable under 15 U.S.C. § 1065;[7] however,

---

5. Interestingly, defendants posttrial did in fact contend "HOTRAY" is not descriptive of anything.

6. Under 15 U.S.C. § 1052(f), a "merely descriptive" mark is denied registration unless it has become "distinctive" of the applicant's goods, by acquiring a secondary meaning. Indeed, when plaintiff applied to register "HOTRAY," the Patent Office at first declined registration of "HOTRAY" as the phonetic equivalent of "hot tray," and so directly descriptive as to be an apt name for the goods. Salton replied, asserting and demonstrating that "HOTRAY" had acquired a secondary meaning. Registra-

tion of "HOTRAY" upon the Principal Register was then granted.

7. The defendants do not assert that "Hot Tray" or "HOTRAY" was the generic name for food warming appliances when Salton first filed its application in 1961 or when it was granted in 1963, and that registration was improper. In any event, such an assertion would be completely untenable. The Patent Office found the mark "HOTRAY" not to be generic or common descriptive. Instead, it found it to be descriptive and granted registration upon a finding of secondary meaning.

if the trademark can be said to have become common descriptive or generic, it is subject to cancellation under 15 U.S.C. § 1064(c).

### Defendants' Claim of Genericness

4. Notwithstanding the Patent Office's determination that "HOTRAY" was the phonetic equivalent of "Hot Tray," and descriptive, defendants contend that their usages of "Hot Tray" and "hot tray" are now generic or common descriptive, and they are therefore entitled to use these terms. In connection with this argument, defendants have not argued noninfringement and seemingly concede that "HOTRAY," "Hot Tray" and "hot tray" are virtually one and the same.

 The Lanham Act, 15 U.S.C. § 1051 et seq., does not use the term "generic" or identify a "generic" mark. The terms "descriptive" and "common descriptive" do appear in the Act: Section 2(e), 15 U.S.C. § 1052(e), refers to a "merely descriptive" mark in connection with registrability; Section 14(c), 15 U.S.C. § 1064(c), dealing with cancellation, and Section 15(4), 15 U.S.C. § 1065(4), dealing with incontestability, refer to the "common descriptive name of an article or substance"; and descriptive "term or device" appears in Section 33(b)(4), 15 U.S.C. § 1115(b)(4), on the matter of "fair use." [8] The word "generic" was and is known to the common law of trademarks, and is used in this decision as a synonym for "common descriptive."

As I have noted, if the terms are generic or common descriptive, the plaintiff's "HOTRAY" is subject to cancellation and the defendants will be free to use "Hot Tray" and "hot tray."

For purposes of this analysis, our starting point is with the proposition that there can be said to be four types of trademarks: (1) generic or common descriptive; (2) merely descriptive; (3) suggestive; and (4) arbitrary or fanciful. *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir. 1976); *Educational Development Corp. v. Economy Co.,* 562 F.2d 26, 28 (10th Cir. 1977).

> Defendants rely upon the principle that
> . . . no matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name.

*Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 F.2d at 9.

 Whether a term is generic, on the one hand, or merely descriptive, on the other, is determined by actual common usage. *See Miller Brewing Co. v. Heileman Brewing Co.,* 561 F.2d 75, 79 (7th Cir. 1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978).

The issue is what the trademark means to the purchasing public and not what the designation means to those in the industry. *Big O Tire Dealers, Inc. v. Goodyear Tire and Rubber Co.,* 561 F.2d 1365, 1369 (10th Cir. 1977).

There is no simple test to ascertain whether a trademark is generic or merely descriptive. The line between the two categories is frequently hard to discern. *Vision Center v. Opticks, Inc.,* 596 F.2d 111, 115 n.11 (5th Cir. 1979); *Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 F.2d at 11.

 The essence of the distinction, though, is whether the trademark has be-

---

**8.** (1) "Descriptive," as it appears in 15 U.S.C. § 1115(b)(4), assumes an existing registration and is applicable only to a registered mark, the right to the use of which has already become incontestable under 15 U.S.C. § 1065(4), and permits fair use on the premise that competitors should have equal right to use that descriptive term.

(2) "Merely descriptive," 15 U.S.C. § 1052(e), identifies a mark which is nonregistrable until secondary meaning has been shown.

(3) The "common descriptive" mark, while not mentioned in the registration portion of the Lanham Act, 15 U.S.C. § 1052(e), derives its nonregistrability status from its inclusion in the cancellation and incontestability sections, 15 U.S.C. §§ 1064(c) and 1065(4).

come so closely associated with the object that for the consuming public it now names that object, or whether the trademark continues only to describe characteristics or functions of the object.

A mark is not generic merely because it has *some* significance to the public as an indication of the nature or class of an article. . . . [T]o become generic the *principal* significance of the work must be its indication of the nature or class of an article, rather than an indication of its origin.

*Feathercombs, Inc. v. Solo Products Corp.,* 306 F.2d 251, 256 (2d Cir.), *cert. denied,* 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962) (emphasis supplied). If the public regards the trademark as being the name of the object itself, then the trademark has become generic and all companies are entitled to use the trademark to name the object. Free use of the trademark is necessary, for to allow one company the sole use of an object's name puts all competitors at a substantial disadvantage—"a competitor could not describe his goods as what they are." *CES Publishing Corp. v. St. Regis Publications, Inc.,* 531 F.2d 11, 13 (2d Cir. 1975) (citations omitted); *Car-Freshner Corp. v. Auto-Aid Manufacturing Corp.,* 461 F.Supp. 1055, 1059 (N.D.N.Y. 1978).[9] Whether or not a particular trademark is generic is a question of fact. 3 Callman Unfair Competition Trademarks & Monopolies, 40 (Supp. 1978).

5. Defendants will not be excluded from the food warmer market if deprived of the use of "Hot Tray" or "hot tray."

Defendants sell a food warmer and have been selling its food warmers since they voluntarily ceased to use "Hot Tray" and "hot tray" over two years ago. The defendants, the plaintiff and other manufacturers all use the term food warmer, or similar designation, to describe the appliance in issue.

6. "Hot Tray" and "hot tray" do not describe the function or use of the defendants' food warming appliance but rather only two characteristics of it, that it gets "hot" and can be considered a "tray." That the words are descriptive, not generic, is clear.

7. The defendant Hudson has not sustained the burden of proving that "hot tray" is the generic name for an electric food warming appliance.

(a) The record is that, of the numerous producers of such appliances, only Cornwall used "hot tray" and abandoned the expression when challenged.

(b) The generic term for electric appliances of the type and function produced by both parties and numerous others is "food warmers." It is strong evidence of that fact that Salton has, itself, used the term "food warmers" as the generic term for its line of electric food warming appliances for more than 25 years. Best Products, a foremost retail catalog merchandiser, has a special interest in using actual generic terms so as to speak the common language of buyers whom they seek to attract. Best Products identifies and advertises both Salton's product, trademarked HOTRAY, and the rival brands as "food warmers." Of eleven manufacturers or distributors other than Salton, five use *Warming*, with other terms such as "electric" or "tray" as the product name. Hammacher-Schlemmer, a principal retailer, advertises the Salton product as "Salton HOTRAY Food Warmer." None uses "hot tray."

 8. Applying these principles to the Findings of Fact, I conclude that "Hot Tray" and "hot tray" are not generic, but merely descriptive. "Hot Tray" and "hot tray" are not the name of the appliance in question but just one way of describing certain characteristics of the object. Other ways of describing significant traits exist, and the record discloses that some of these

---

9. *See Delaware & H. Canal Co. v. Clark,* 13 Wall. 311, 323, 20 L.Ed. 581 (1871):

No one can claim protection for the exclusive use of a trademark or trade name which would practically give him a monopoly in the sale of any goods other than those produced or made by himself. If he could, the public would be injured rather than protected, for competition would be destroyed.

other descriptions are used by food warmer manufacturers. A variety of different names—none of which includes the words "hot" and "tray" in direct sequence—can be and have been used successfully. Indeed, the defendants themselves have called their appliance a "thermo glass tray," a "radiant glass tray," a "hot electric tray," and an "electric server." On these facts it is clear that the phrase "hot tray" has not acquired the property of being the name by which electrical food warming appliances are generally known; "hot tray" is still but one of many ways of describing a feature of the appliance. Accordingly, the term "hot tray" is a descriptive, not generic, name for electric food warming appliances.

9. The defendants' reliance upon *Miller Brewing Co. v. G. Heileman Brewing Co., Inc. supra,* is misplaced. Miller, having lost the benefit of registrability on a technical basis, had its mark "Lite" subject to a common law analysis.[10] Each case must be decided on its own peculiar facts. As I have stated, the lines between "common descriptive" or "generic" and "descriptive" are usually vague and indistinct. Their placement rests upon a subtle calculus founded ultimately upon the perception of the consuming public as determined by the court. *Union Carbide Corp. v. Ever-Ready, Inc. supra,* 531 F.2d at 378–79; *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 561 F.2d at, 1369. Indeed, a word may be "generic" in one setting and descriptive, suggestive or fanciful in another. *Abercrombie & Fitch Co. v. Hunting World, Inc. supra.* In *Miller,* the court found "lite" or "light," in connection with beer, to be a generic term because it ". . . has been widely used in the beer industry for many years . . . ." *Id.* at 80. In the instant case, the reverse is true. "Hot Tray" has not been widely used as the name for electric food warming appliances and the generic term, in wide use, is some version of "Food Warmer." Moreover, there is basis for challenging the *Miller* Court's analysis and conclusions. *See* discussion in Callman, *supra,* § 74.4, 36–44 (Cum.Supp.1978).

---

10. Thus Miller lost the benefit of the law that registration is prima facie evidence of the ex-

### The Effect of Incontestability Upon a Descriptive Mark In an Infringement Suit

10. Generally, trademarks that are merely descriptive cannot give rise to a claim of infringement. *Union Carbide Corp. v. Ever-Ready Inc., supra,* 531 F.2d at 378. This general rule, however, does not apply to trademarks that are incontestable. Once incontestability has been established pursuant to 15 U.S.C. § 1065, a defendant accused of trademark violation can defend itself only on the seven grounds enumerated in 15 U.S.C. § 1115. Since Salton has complied with the requirements of 15 U.S.C. § 1065 and "hot tray" is not the generic name for electric food warming appliances, the defendants are limited to those seven defenses. *Council of Better Business Bureaus v. Better Business Bureau of South Florida, Inc.,* 200 U.S.P.Q. 282, 289 (S.D.Fla. 1978); *Rolls-Royce Motors, Ltd. v. A. &. A. Fiberglass, Inc.,* 428 F.Supp. 689, 695 n.11 (N.D.Ga. 1977). Accordingly, the fact that "hot tray" is descriptive is not significant, for descriptiveness is not one of the seven available defenses. *Armstrong Cork Co. v. World Carpets, Inc.,* 448 F.Supp. 1072 (N.D.Ga. 1978), *aff'd,* 597 F.2d 496 (5th Cir. 1979).

However, a line of cases has held that incontestability can be used only defensively—as a shield when validity of a trademark is questioned—and not offensively when pursuing an infringement action. *E. g., Sid Berk, Inc. v. Uniroyal, Inc.,* 194 U.S.P.Q. 476 (C.D.Cal. 1977); *Electrical Information Publications, Inc., v. C–M Periodicals, Inc.,* 163 U.S.P.Q. 624 (N.D.Ill. 1969). This restricted view of incontestability originated with *John Morrell & Co. v. Reliable Packing Co.,* 295 F.2d 314 (7th Cir. 1961). *Morrell* has been overruled by the Seventh Circuit. *Union Carbide Corp., supra.* The reasoning in *Union Carbide* is persuasive, for, as the court noted, "[t]here is no defensive/offensive distinction in the

---

clusive right to a mark, under Section 33(a) of the Lanham Act, 15 U.S.C. § 1115(a).

statute, and . . . one should [not] be judicially engrafted on to it." *Id. See Council of Better Business Bureaus, supra,* 200 U.S.P.Q. at 291 (finding offensive/defensive distinction unsupportable). *Compare Wrist-Rocket Manufacturing Co., Inc. v. Saunders Archery Co.,* 578 F.2d 727, 731 n.4 (8th Cir. 1978) (no occasion to consider offensive/defensive dichotomy). I find the better reasoned view to be that incontestability can be used offensively, meaning that in this infringement action the defendants are limited to the seven defenses specified in 15 U.S.C. § 1115(b) and that the descriptiveness of "Hot Tray" and "hot tray" does not defeat this lawsuit.

■■■■ 11. I would reach the same conclusion as in 9, *supra,* even if the plaintiff could not rely on the incontestability of its trademark. Trademarks that are descriptive can be the basis for infringement actions if the mark has acquired secondary meaning. *Bada Co. v. Montgomery Ward & Co.,* 426 F.2d 8, 11 (9th Cir.), *cert. denied,* 400 U.S. 916, 91 S.Ct. 174, 27 L.Ed.2d 155 (1970); *Day-Brite Lighting, Inc. v. Sta-Brite Fluorescent Manufacturing Co.,* 308 F.2d 377, 382 (5th Cir. 1962). Secondary meaning comes about when a phrase or name has been used so long and so exclusively by one producer that to consumers of the item the word or phrase now means that producer's product. *Union Carbide Corp., supra,* 531 F.2d at 380; *Bardahl Oil Co. v. Atomic Oil Co. of Oklahoma,* 351 F.2d 148, 150 (10th Cir. 1965), *cert. denied,* 382 U.S. 1010, 86 S.Ct. 619, 15 L.Ed.2d 526 (1966).

■■■ This condition has been satisfied for Salton's "HOTRAY." Through extensive advertising and long-time promotion of its "HOTRAY" appliances, *see Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1228 (3d Cir. 1978), Salton has achieved the status of one whose trademark means that the product comes from a single supplier of the goods. That Salton has attained this position became evident during the testimony of Salton's expert witnesses. Based on their testimony, which has been accepted as true, the court finds that purchasers who seek to buy an appliance pronounced as "hot tray" believe that it comes from one source. Accordingly, Salton's "HOTRAY" has acquired secondary meaning and could be the basis of an infringement suit even in the absence of offensive incontestability. *See Car-Freshner Corp., supra,* 461 F.Supp. at 1059 n.7.

### Fair Use

■■■ Defendants claim the benefit of "fair use" under 15 U.S.C. § 1115(b)(4). Essentially, this defense provides that, as against the trademark owner, the "user of the word may assert the defense that his use, challenged as an infringement, is a use, otherwise than as a trademark, of a term which is descriptive of, and fairly used in good faith solely to describe his goods or their geographic origin." Callman, § 85.1, 990. *See Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 F.2d at 12. The defendants have the burden of establishing the validity of this defense. *Jockey International, Inc. v. Burkard,* 185 U.S.P.Q. 201 (S.D. Cal. 1975); *Philip Morris, Inc. v. Imperial Tobacco Co., Ltd.,* 251 F.Supp. 362, 379 (E.D.Va. 1965), *aff'd,* 401 F.2d 179 (4th Cir. 1968), *cert. denied,* 390 U.S. 1094, 89 S.Ct. 875, 21 L.Ed.2d 784 (1969). This defense, though, is available even if there is a likelihood of confusion. *Laura Secord Candy Shops Ltd. v. Barton's Candy Corp.,* 368 F.Supp. 851, 853 (N.D.Ill.1973).

■■■ The defendants are not entitled to the "fair use" defense. "Hot Tray" when used in the phrase "Broil King Hot Tray" is a trade name and not descriptive. Even were it not, however, defendants' use of the term "hot tray" or "Hot Tray" is neither fair nor in good faith. Its use has only one objective, to trade upon plaintiff's good will, to compete unfairly. *See* Callman, § 85.1(b), 996, n.66 and cases there cited. Salton has expended a considerable amount of energy and money in trying to establish in the consuming public's mind the idea that only one source exists for the item known as a "hot tray." Salton has succeeded in this endeavor. To allow a newcomer to enjoy the fruits of Salton's labor would

not be fair. Indeed, although apparently no court has faced the issue, it is doubtful that a "fair use" defense should ever be available when secondary meaning has been shown. A company that has through its own efforts achieved the status of secondary meaning for its trademark should not have the value of its work depreciated by having to share the name with an interloper.

The unfairness of permitting the junior user to use the name also becomes even more evident when the junior user's selection of product name is best explained as an attempt to compete directly with the senior user. Among the sellers of small electric food warming appliances, Salton alone uses the name "HOTRAY"; therefore, the choice of the name "hot tray" by the defendants may be viewed as an attempt primarily by them to compete primarily with Salton.

The defendants cannot defend their name selection by necessity: other companies have thrived for many years using other names for the appliances. The defendants themselves introduced no evidence that they had been injured during the last 2½ years because they refrained from calling their appliance a "hot tray." Also, it must be observed that the defendants adopted the marks suddenly, without a history of past use, 14 years after Salton registered the mark. *Cf. Abercrombie & Fitch, supra,* 537 F.2d at 12 (allowing fair use defense where no attempt to garner the trademark owner's goodwill, partly because the defendant itself had previously used the term in an unrelated field).

Accordingly, the use by the defendants of the name "hot tray" does not constitute fair use, and the defendants cannot avail themselves of the fair use defense.

### Infringement

■ 13. The final issue that must be disposed of is whether sales by the defendants of an item called a "Hot Tray" or "hot tray" infringes on Salton's registered trademark "HOTRAY." In order to prevail on this point, the plaintiff need only show that the defendants' use of "hot tray" "is likely to cause confusion" between their product and Salton's. Actual confusion does not have to be demonstrated. *Scarves by Vera, Inc. v. Todo Imports, Ltd.,* 544 F.2d 1167, 1175 (2d Cir. 1976); *Louis Rich, Inc. v. Horace W. Longacre, Inc.,* 423 F.Supp. 1327, 1338 (E.D.Pa. 1976). The test is "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

The defendants do not appear to have argued that their use of "hot tray" is not likely to cause confusion. In any case, that defense could not be sustained.

■ 14. Analysis of likelihood of confusion does not rest on a single factor. A variety of variables must be sifted and weighed. *Scott Paper Co. v. Scott's Liquid Gold, Inc., supra; McGregor-Doniger, Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1130, 202 U.S.P.Q. 81, 86 (2d Cir. 1979); *Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.,* 560 F.2d 1325 (7th Cir. 1977).

15. The Lanham Act makes it unlawful to

use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(1)(a).

In *Union Carbide Corp. v. Ever-Ready, Inc., supra,* the issue was whether "EVER-EADY" was infringed by "EVER-READY" applied to a noncompeting article. The court stated:

The district court found that the parties' marks were dissimilar. The conclusion was based "on the whole appearance" of the marks, and we would agree that when the marks are placed side-by-

side differences are readily apparent. However, as the district court noted at an earlier point in its opinion, a side-by-side comparison of the marks is not the proper test. The test is the consumers' state of mind when faced with the marks individually. *G. D. Searle & Co. v. Chas. Pfizer & Co., Inc.*, 265 F.2d 385, 388 (7th Cir. 1959), *cert. denied*, 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed.2d 65; *Independent Nail & Packing Co., Inc. v. Stronghold Screw Products, Inc. supra*, 205 F.2d at 924. Courts have often held that small changes in words, such as adding or deleting a hyphen, are insufficient to distinguish marks. *E. g., Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479 (S.D.N.Y.1968). Indeed, the terms "EVEREADY" and "EVER–READY" have been held to be "in legal contemplation identical." *Union Carbide Corporation v. Midwest Mower Corporation*, 132 U.S.P.Q. 689 (T.T.A.B.1962). In *Independent Nail* the district court distinguished the parties' marks stating that the marks had no resemblance to each other beyond the use of the word "Stronghold." This court reversed stating: "The court apparently gave no weight to the fact that "Strongheld" is the most prominent word in defendant's mark while "Stronghold Nails" are the most prominent words appearing in plaintiff's mark." 205 F.2d at 924. Consumers often do not retain a clear impression of the precise form in which a mark appears. This is not from carelessness but rather is due to the fallibility of the human memory. In *Spangler Candy v. Crystal Pure Candy Co.*, [353 F.2d 641] *supra*, we indicated:

"It is sufficient if one adopts a trade name or a trade mark [sic] so like another in form, spelling, or sound that one, with a not very definite or clear recollection as to the real trade-mark [sic], is likely to become confused or misled." 353 F.2d at 644.

*See also Stix Products, Inc. v. United Merchants & Manufacturers Inc., supra.* We find no evidence of bad faith on the part of Ever-Ready, but the latecomer has a responsibility to avoid confusion. 531 F.2d at 382. (footnote omitted)

16. The strength of the mark is one important consideration. Salton's mark obviously possesses great strength in the field of electric food warming appliances. I have held that "HOTRAY" has acquired secondary meaning. "Proof of secondary meaning . . . can only enhance the strength of its mark." *McGregor-Doniger, supra*, 202 U.S.P.Q. at 86. Unlike the situation in *Scott Paper*, the mark covers the type of product sold by the defendants.

17. The evidence on similarity of the marks is less clear. Neither party presented to the court any evidence concerning the packaging of the actual products. Thus I cannot determine whether a consumer viewing the products side-by-side is likely to find the trademarks similar. However, similarity need not be visual; it can also be aural. *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1340 (2d Cir. 1975). The two names, Salton's "HOTRAY" and the defendants' "Hot Tray" and "hot tray" are phonetic twins, and that is a sufficient basis for finding similarity. However, "Hot Tray" and "HOTRAY" to the average consumer may well be read as the same.

As *Union Carbide Corp. v. Ever-Ready, Inc., supra*, 531 F.2d at 382, pointed out, the test is not a side-by-side comparison, but the consumer's state of mind when faced with the marks individually. Here the fallibility of human memory must be taken into account. It is sufficient if a similarity in spelling and sound is such that one "with a not very definite or clear recollection as to the real trade-mark is likely to become confused or misled," quoting *Spangler Candy v. Crystal Pure Candy Co., supra*, 353 F.2d at 644, on the question of similarity of marks. I find that the names sound and look sufficiently alike so as to increase the likelihood of confusion. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 at 351–52 (9th Cir. 1979).

18. Proximity of the products also increases the likelihood of confusion. *Id.* at

352. The competing products are likely to be physically near each other in retail outlets, since the areas and channels of retail distribution are generally the same. The evidence reflected that Gimbels sells both Salton's and Hudson's food warmers concurrently.

19. Another factor is the care of consumers in selecting the item. *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, supra,* 523 F.2d at 1341–42. Because the electric food warming appliances sold by the two parties are relatively moderate in price, the likelihood of confusion is enhanced. *Chips 'N Twiggs, Inc. v. Chip-Chip, Ltd.,* 414 F.Supp. 1003, 1016 (E.D.Pa. 1976). As *Union Carbide Corp. v. Ever-Ready, Inc., supra,* 531 F.2d at 388, noted, the " . . . purchasers of high value items are likely to study the product they are purchasing more carefully than the purchasers of a low value item."

■ 20. Bridging the gap between the products, though sometimes an issue, *see Scott Gold, supra,* is not a factor here. Salton's "HOTRAY" products and defendants' line of merchandise that would be called "Broil King Hot Tray" currently compete in the same market. Actual confusion, or its absence, is not a factor because there has been no chance for confusion to arise. The issue of good faith has been resolved against the defendants. Intent of the actor is relevant on the issue of likelihood of confusion if the junior mark is used for the purpose of taking advantage of goodwill generated by the efforts of the holder of the senior mark. *President and Trustees of Colby College v. Colby College-New Hampshire,* 508 F.2d 804, 811–12 (1st Cir. 1975); *Q-Tips, Inc. v. Johnson & Johnson,* 206 F.2d 144, 147 (3d Cir.), *cert. denied,* 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086 (1953). Despite a wide variety of other possible names, the defendants used, and still intend to use, "Hot Tray" and "hot tray." Given the success Salton has had in getting consumers to regard the item pronounced "hot tray" as originating with one source, and the absolute lack of need for the defendants to employ the name "hot tray,"

the defendants' insistence on employing that phrase is most easily understood as an attempt to reap an advantage sown and nurtured by Salton for itself.

21. Evidence was not introduced on the sophistication of the buyers. At the very least, however, in view of the moderate price of the item, the large volume of sales of electric food warmers each year, and the likelihood that the buyers of this appliance probably do not differ much from the public at large, this factor does not favor the defendants.

22. Taking the foregoing factors into consideration, the plaintiff must prevail on the question of likelihood of confusion. No component of the analysis suggests that there is no likelihood of confusion, while several important factors uphold the plaintiff's position that confusion is likely.

### Unfair Competition

■ 23. Given the foregoing Findings of Fact and Conclusions of Law, use by the defendants of "Hot Tray" and "hot tray" constitutes unfair competition under New Jersey law. *Red Devil Tools v. Tip Top Brush Co.,* 50 N.J. 563, 236 A.2d 861 (1967).

Accordingly, judgment will be entered in favor of the plaintiff and against the defendant.

### Relief

(a) *Injunction*:

■ 24. Given defendants' expressed intentions, the plaintiff is entitled to the injunction it seeks, namely, that defendant may not use the words "Hot Tray" or "hot tray" in direct sequence in selling, marketing, advertising or promoting its food warmer. Defendants may use the words "Hot" and "Tray," or "hot" and "tray" if these words are separated by "electrical" or some other word or words.

(b) *Damages*:

■ 25. The plaintiff seeks to recover from the defendants $12,000 to compensate it for the loss of its officers' time resulting from the necessity to bring suit. No au-

thority is cited by the plaintiff in support of its position that this comprises a compensable element of damages under the Lanham Act. The statute provides that a plaintiff may recover, "subject to the principles of equity," "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." The defendants did not profit by their infringement, and the plaintiff suffered no damages as a result of the advertisements that were run. *See Caesar's World, Inc. v. Venus Lounge, Inc.,* 520 F.2d 269, 274 (3d Cir. 1975). As for the costs of the action, assuming that executives' time falls within this category, the court believes that equity precludes the making of such an award. Generally, "costs are allowable only where the wrongdoer's action is fraudulent, willful, or in bad faith." *Frostie Co. v. Dr. Pepper Co.,* 361 F.2d 124, 127 n.9 (5th Cir. 1966) (trademark case under the Lanham Act) (citations omitted). The facts of the case in *A. Smith Bowman Distillery, Inc. v. Schenley Distillers, Inc.,* 204 F.Supp. 374, 380 (D.Del. 1962), where costs were denied, were similar to the facts of this case: the defendants fairly participated in the litigation without delay; no sales were made under the offending name after the plaintiff objected; there was no malice in the defendants' use of the trademark; and there was no attempt to capitalize on confusion. *See Airstream Trailers, Inc. v. Cayo,* 221 F.Supp. 557, 561 (W.D.Mich. 1963) (costs denied even though court believed purpose of litigation may have been to force the defendants out of business).

Accordingly, the plaintiff's request for compensation for the time of its executives is denied.

Plaintiff does not claim any other elements of damages.

### Attorneys' Fees

■ 26. The plaintiff seeks to recover attorneys' fees under 15 U.S.C. § 1117. The court holds that this is not an "exceptional" case bringing the defendants' actions within the ambit of that statute. The defendants' actions cannot be characterized as "fraudulent," "deliberate," "willful," or "malicious." *See Five Platters, Inc. v. Purdie,* 419 F.Supp. 372, 385 (D.Md. 1976). *Compare Amana Society v. Gemeinde Brau, Inc.,* 417 F.Supp. 310, 311–12 (N.D.Iowa 1976) (defendant requested use of trademark, was denied permission, but used name anyway).

Thus, statutory attorneys' fees are denied.

■ 27. The plaintiff also seeks attorneys' fees based on its common law unfair competition action. The New Jersey Supreme Court has held that in at least some instances of trademark violation counsel fees may be awarded. *Red Devil Tools, supra,* 50 N.J. at 575, 236 A.2d at 868. As is true here, the plaintiff in *Red Devil* had not lost any business or suffered an injury to its goodwill. Therefore, the lack of actual injury is no bar to awarding attorneys' fees.

■ In permitting the recovery of attorneys' fees, the Supreme Court noted that the defendants knew that they were using a name long associated with another company. The court further noted that a deterrent purpose would be served by granting attorneys' fees. These factors apply here, as does the additional consideration that a grant of counsel fees would help take care of the real costs to the plaintiff of having to pursue this action. Therefore, this court holds that the plaintiff is entitled to attorneys' fees under New Jersey law.[11]

*Electronics Corp. of America v. Honeywell, Inc.,* 358 F.Supp. 1230, 1326 (D.Mass.), *aff'd per curiam on opinion of district court,* 487 F.2d 513 (1st Cir. 1973), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1491, 39 L.Ed.2d 575 (1974), does not compel a different result. The court's suggestion that *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386

---

11. This result is not inconsistent with declining to award fees under the Lanham Act. Costs may be given there only if the conduct of the losing party sinks to the level of being fraudulent or in bad faith. New Jersey law permits the awarding of fees without the need to show such inappropriate conduct. Indeed, the defendant in *Red Devil* sought, and followed, advice of counsel in registering the infringing name.

U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), precludes the awarding of attorneys' fees in copyright cases brought under common law is based on the premise that the American rule regarding attorneys' fees governs the common law action. That, however, is not true in New Jersey. *Red Devil* quite clearly establishes an exception to the American rule for trademark cases where the awarding of attorneys' fees would be appropriate. Since *Electronics Corp.*'s analysis hinges on the assumption that the American rule applies and that assumption is erroneous for New Jersey common law trademark cases, the view expressed by *Electronics Corp.* has no relevance here.

The plaintiff within 10 days will submit appropriate documentation to support its claim for a specific amount of attorneys' fees. Defendants will respond 10 days thereafter. The matter will then be set down for hearing.